L. Vincent RAMUNNO, Plaintiff Below, Appellant,

v.

Charles M. CAWLEY, MBNA America Bank, N.A., Gannett Co. t/a the News Journal Company and Cris Barrish, Defendants Below, Appellees.

No. 530, 1996.

Supreme Court of Delaware.

Submitted: Nov. 19, 1997.
Decided: Jan. 22, 1998.

L. Vincent Ramunno (argued), and Glenn C. Ward, Ramunno & Ramunno, Wilmington, for Appellant.

Steven J. Rothschild (argued), Andrew J. Turezyn, Pamela J. Jones, of Skadden, Arps, Slate, Meagher & Flom, Wilmington; and Charles M. Oberly, III, Kathleen M. Jennings, and Lawrence S. Drexler, Wilmington, for Appellees Charles M. Cawley and MBNA America Bank, N.A.

Richard G. Elliott, Jr. (argued), and John T. Dorsey, of Richards, Layton & Finger, Wilmington, for Appellees the News Journal Company and Cris Barrish.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

In this appeal we reverse, in large part, the decision of the Superior Court to dismiss the complaint under Superior Court Civil Rule 12(b)(6). The complaint asserted claims for libel and civil conspiracy against both media and non-media defendants. We rest our decision solely on pleading rules. A dismissal under Rule 12(b)(6) is proper only where the complaint, construed most favorably to the plaintiff, fails as a matter of law to state a claim on which relief can be granted. The trial court's dismissal here does not meet that test.

### Facts [1]

MBNA America Bank, N.A. ("MBNA") is a national banking association headquartered

---

1. The following facts we draw from the face of the complaint, as required by Superior Court

in Delaware. At the time this controversy arose, MBNA was constructing a four-building office complex in downtown Wilmington. In connection with this project, in the spring of 1996, MBNA and members of Wilmington's municipal government sought to close off a portion of French Street and convert it to a pedestrian plaza. When their intentions became public, however, L. Vincent Ramunno, a local lawyer and land developer, announced his opposition to the proposed street closure and launched a public campaign against the plan. His efforts were ultimately successful, as public opposition forced MBNA to abandon its goal of closing permanently a portion of French Street.

On June 6, 1996, Charles M. Cawley, Chairman of the MBNA Board of Directors, sent a letter to the Mayor of Wilmington and all members of the Wilmington City Council. According to Cawley, the purpose of the letter was to share with city officials the "real motivation" behind Ramunno's opposition to MBNA's closure plan. Referring to Ramunno as a "local land speculator," Cawley's letter noted that MBNA purchased a few parcels of land from Ramunno after MBNA announced its decision to move into Wilmington. Cawley claimed that, "Mr. Ramunno's opposition to MBNA arises from the fact that [MBNA] chose not to purchase additional land from him and that he has learned that many other landowners in the City sold property to MBNA." In the passages that lie at the heart of this litigation, Cawley wrote,

> As you may know, in addition to his law office at 10th and French Streets, Mr. Ramunno owns many small parcels of land in Wilmington, including approximately 70 parcels on the Eastside. A number of these parcels are vacant and used as parking lots—one of which has been cited for violations of the City Code. Others are row houses, some of which are occupied by tenants and some of which are boarded up and vacant. Many of these parking lots and row houses are poorly maintained. . . .

Obviously, Mr. Ramunno's motives are questionable. For a man who has done well through poorly-maintained surface parking lots and rental homes in the Eastside neighborhood to portray himself as the spokesman for that same neighborhood strikes us as very odd, inconsistent and almost humorous.

Also on June 6, 1996, Cawley delivered a copy of this letter to Gannett Co., a Delaware corporation that owns and operates *The News Journal,* a daily paper published in Wilmington. Accompanying the letter was a list of properties owned by Ramunno. *The News Journal* dispatched one of its reporters, Cris Barrish, to interview Ramunno regarding Cawley's letter. Over the course of the interview, Ramunno explained to Barrish that, of the properties on the list, only five were houses and that only one-half of one house was occupied at that time. Ramunno complained to Barrish that the letter was a "ridiculous" attempt on Cawley's part to portray Ramunno as a "slumlord." Barrish allegedly agreed and assured Ramunno that he knew Ramunno was not a slumlord.

Following the interview, Barrish drafted an article about Cawley's letter and the ongoing public controversy surrounding the proposed closing of French Street. *The News Journal* published the article on June 7, 1996, under the headline "MBNA chairman blasts landowner as slumlord." [2] The article described Cawley's letter of June 6th and quoted both Cawley and Ramunno at length. In recounting Ramunno's reaction to the letter, Barrish wrote,

> Ramunno fumed at the assertion that he doesn't maintain his properties, which number about 70 and include parking lots and rowhouses—a few of them vacant and boarded.

> "He makes it sound like I'm a slumlord," Ramunno said. "It's ridiculous."

> Ramunno said MBNA had offered to buy one of his parking lots but negotiations

---

Civil Rule 12(b)(6). To flesh out the factual background to this appeal, however, we have supplemented Ramunno's allegations with facts that are not in dispute and are fully consistent with his complaint.

**2.** In a later edition of *The News Journal,* the article ran under the headline, "MBNA chairman rips opponent of street closing." *See infra* note 36.

fizzled. "I don't care whether they buy my stuff or not."

Despite twice stating that Ramunno owned approximately 70 parcels of land, Barrish never described in the article the extent of Ramunno's holdings. Nowhere did the article explain that only five of Ramunno's properties were houses and that only one-half of one property was occupied at that time. The complaint alleged that this omission led to incorrect and defamatory inferences that fueled the "slumlord" headline.

On June 11, 1996, a cartoon appeared on the editorial page of *The News Journal* satirically depicting the dispute between Cawley and Ramunno. The cartoon shows an oversized Cawley sitting on what appears to be MBNA's downtown headquarters, while Ramunno sits atop a dilapidated building identified only as "Property of L. Vincent Ramunno." The caption reads, "Two renowned street fighters." The complaint alleged that the cartoon is defamatory.

### The Complaint and its Dismissal

On June 25, 1996, Ramunno filed suit in the Superior Court, asserting claims of libel and civil conspiracy against Cawley, MBNA, Gannett Co., and Barrish. As to Cawley and MBNA (collectively, the "MBNA Defendants"), the complaint alleged an intention on their part to cast Ramunno in a false and humiliating light through inaccurate statements contained in the letter. More specifically, the complaint alleged libel in the form of Cawley's description of Ramunno's holdings, as well as his statement in this context that Ramunno has "done well through poorly-maintained surface parking lots and rental homes...."

In pertinent part, as to the MBNA Defendants, the complaint reads as follows:

[Cawley's] letter contained false statements that clearly and intentionally were intended to infer [sic] that Ramunno was a "slumlord" and that Ramunno was exploiting the poor people of the Eastside of Wilmington and owned a substantial number [sic] of slum and/or substandard tenement or rental housing....

At the time Cawley and MBNA made said false and malicious statements, they knew that the above statements were totally false since they knew that out of the 70 parcels Ramunno owned, 65 parcels were either parking lots, vacant lots or commercial properties and only five parcels were houses. (In fact, four houses were vacant and only one house was even occupied.)

As to Gannett Co. and Barrish (collectively, the "Gannett Defendants"), the complaint alleged that the Gannett Defendants knew that Cawley's letter contained false statements and that MBNA was trying to portray Ramunno as a "slumlord." It is uncontested that it was Ramunno who injected the term *slumlord* into the controversy, but he claims the inference is irresistible without his supplying the term, given the context. Ramunno claimed that the Gannett Defendants "maliciously" caused him to be viewed as a "slumlord" by including that term in its headline, above an article that contained inaccurate descriptions of his land holdings.

In pertinent part, as to the Gannett Defendants, the complaint reads as follows:

Ramunno explained to Barrish that of those five houses, four were vacant and only one house was occupied.... Ramunno told Barrish that Cawley was trying to falsely and maliciously make Ramunno look like a "slumlord" and that was ridiculous and was a total fabrication.... Barrish agreed that Cawley was trying to make Ramunno look like a "slumlord" and Barrish agreed and admitted that that was ridiculous and that Ramunno was certainly not a "slumlord." ...

In total disregard of the truth, Barrish maliciously and intentionally caused Ramunno to be viewed as a "slumlord" as Cawley intended by stating twice in the story that Ramunno owned some 70 parcels without informing the readers of the truth [about his property holdings]....

Although Barrish agreed and admitted that renting one house is a far cry from being a "slumlord", he intentionally did not state in his news story that only one house (or one-half of a house) was being rented....

[A]s part of Cawley's & MBNA's premeditated plan to defame Ramunno's char-

acter in the eyes of the public, Cawley & MBNA used their influence and power to cause the codefendant Gannett to proclaim Ramunno a "slumlord" in a totally inappropriate front page banner headlines [sic]. . . .

The Defendants knew that Ramunno was not a "slumlord" and had never exploited the poor people of the Eastside [or] anywhere else, but nevertheless falsely and maliciously proclaimed him as a "slumlord" as part of their premeditated plan to defame his character and his reputation in the community. . . . As a direct and proximate result of Defendants' false and malicious libelous statements the Defendants have defamed Plaintiff's character and reputation in the community. . . .

Finally, in addition to the libel claims, the complaint alleged that the Gannett Defendants conspired with the MBNA Defendants to cast Ramunno as a slumlord in the public eye.

On July 22, 1996, the defendants moved pursuant to Superior Court Civil Rule 12(b)(6) to dismiss Ramunno's complaint for failure to state a claim on which relief can be granted. On December 12, 1996, the Superior Court granted the motion, holding that, as a matter of law, all the statements in question and the cartoon were non-actionable. After finding that Ramunno's complaint failed to plead facts sufficient to state a claim for libel, the Superior Court dismissed as well his claim for civil conspiracy, citing the lack of any underlying tort. Ramunno appeals this decision.

### Standard and Scope of Review

 Long-settled doctrine governs our review of dismissals under Rule 12(b)(6). Dismissal for failure to state a claim on which relief can be granted is appropriate only where it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief.[3] Only if a court can say that the plaintiff could prevail on no state of facts inferable from the pleadings may it dismiss the complaint under Rule 12(b)(6).[4] To survive a motion to dismiss, the complaint need only give general notice of the claim asserted.[5]

 We review such dismissals de novo.[6] Our review is limited to the well-pleaded allegations contained in the complaint.[7] We accept all well-pleaded allegations as true,[8] but we ignore conclusory allegations that lack specific supporting factual allegations.[9] Finally, throughout our examination of dismissals under Rule 12(b)(6), we remain heedful of our duty to draw all reasonable inferences in favor of the non-movant[10]—in this case, Ramunno.

### The Libel Claims against the MBNA Defendants

The Superior Court reached in two steps its conclusion that the claims asserted against the MBNA Defendants were not viable. First, it decided that the description of Ramunno's property holdings contained in Cawley's letter—including the statement that "some" of Ramunno's rowhouses are occupied by tenants—was "substantially true" and therefore not libelous, even if technically inaccurate. Second, the Court held that Cawley's statement that Ramunno "has done

**3.** *Spence v. Funk*, Del.Supr., 396 A.2d 967, 968 (1978).

**4.** *Solomon v. Pathe Communications Corp.*, Del. Supr., 672 A.2d 35, 38 (1996) (citing *In re USA-Cafes, L.P. Litig.*, Del. Ch., 600 A.2d 43, 47 (1991) (citing *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985))).

**5.** *Solomon*, 672 A.2d at 38 (quoting *Rabkin*, 498 A.2d at 1104).

**6.** *Precision Air, Inc. v. Standard Chlorine of Del., Inc.*, Del.Supr., 654 A.2d 403, 406 (1995); *Unitrin, Inc. v. American Gen. Corp.*, Del.Supr., 651 A.2d 1361, 1385 (1995).

**7.** *In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 65 (1995) (citing *In re Tri–Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 326 (1993)).

**8.** *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 n. 6 (1988).

**9.** *In re Tri–Star Pictures, Inc. Litig.*, 634 A.2d at 326.

**10.** *Solomon*, 672 A.2d at 38; *Grobow*, 539 A.2d at 187 n. 6; *Tatro v. Esham*, Del.Super., 335 A.2d 623, 625 (1975).

well through poorly-maintained parking lots and rental homes" was a constitutionally-protected expression of opinion. We disagree with both of these conclusions.

 The law of libel enjoys a constitutional grounding.[11] We have interpreted Section 9 of the Delaware Bill of Rights,[12] colloquially referred to as the "open courts" or "remedies" clause, to provide a "strong state constitutional basis for remedies to recompense damage to one's reputation."[13] Libel itself consists of a false and defamatory statement of fact concerning the plaintiff made in an unprivileged publication to a third party.[14] But a statement is not defamatory unless it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[15] Moreover, a statement of fact is not libelous if it is "substantially true."[16] That is, no libel has occurred where the statement is no more damaging to plaintiff's reputation in the mind of the average reader than a truthful statement would have been.[17] Immaterial errors do not render a statement defamatory so long as the "gist" or "sting" of the statement is true.[18]

 Cawley's account of Ramunno's property holdings was clearly a statement of fact. In his complaint, Ramunno alleged that it is false and defamatory because Cawley's description—specifically, his use of the adjec-

tive *some*—implies that Ramunno has multiple tenants in his rowhouses, when in fact, he rents out only one-half of one of his five houses. In response, the MBNA Defendants referred the Superior Court to Webster's Dictionary, which defines *some* as "one, a part or an unspecified number" and "at least one." The Superior Court declined to resolve this interpretive debate, deciding instead that the gist of Cawley's description was accurate. The Court held that any error in the account was basically harmless, and that rewriting the letter to convey that Ramunno owns only one house that is currently occupied would make no difference in the minds of the readers.

 Cawley's description of Ramunno's land holdings is, in fact, inaccurate, when we construe the complaint most favorably to the plaintiff. All but one-half of one of Ramunno's houses are vacant. Cawley's letter, however, states that "some" of them are occupied. To be sure, the adjective *some* may not imply that Ramunno owns a vast empire of Eastside tenements, but we believe that an average reader could accept that term as a plural modifier. In suits for libel and defamation, dictionary definitions do not control the interpretation of allegedly defamatory statements. Rather, courts must "take the words in their plain and natural meaning and understand them as would a person of

---

11. *See generally Kanaga v. Gannett Co.*, Del. Supr., 687 A.2d 173, 176–77 (1996).

12. Article I, Section 9, of the Delaware Constitution provides:
 § 9. **Courts shall be open; remedy for injury; suits against State.**
 Section 9. All courts shall be open; and every man for an injury done him in his *reputation*, person, movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense. Suits may be brought against the State, according to such regulations as shall be made by law.
 DEL. CONST. art. I, § 9 (emphasis added). *See* Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 OR. L. REV. 1279 (1995) (Delaware had the first "open court" clause in America).

13. *Kanaga*, 687 A.2d at 177.

14. *Gonzalez v. Avon Products, Inc.*, D. Del., 609 F.Supp. 1555, 1558 (1985), *aff'd*, 3d Cir., 822 F.2d 53 (1987). In the context of a motion to dismiss a libel suit, it is for the court to determine as a matter of law whether the allegedly defamatory statements are protected expressions of opinion, and whether statements of fact are susceptible of a defamatory meaning. *See Riley v. Moyed*, Del.Supr., 529 A.2d 248, 253 (1987).

15. *Spence*, 396 A.2d at 969 (citing Restatement (Second) of Torts § 559 (1977)).

16. *Gannett Co. v. Re*, Del.Supr., 496 A.2d 553, 557 (1985).

17. *Riley*, 529 A.2d at 253.

18. *Gannett Co.*, 496 A.2d at 557.

average intelligence and perception."[19] Keeping in mind this rule of interpretation—as well as our duty to draw inferences in favor of Ramunno, the non-movant—we hold that the allegation in the complaint that Cawley's letter contains a false description of Ramunno's property holdings cannot be dismissed on the pleadings.

The Superior Court erred in dismissing this part of the complaint on the rationale that the description is substantially true. We do not necessarily disagree with the substance of that finding. The trier of fact might very well find that the error was immaterial and that the controversy itself is trivial. Indeed, on a summary judgment record or at trial, the defendants may be successful in portraying this dispute as silly. But in dismissing the complaint on this ground, the Superior Court strayed from the time-honored rules governing motions to dismiss under Rule 12(b)(6) by failing to draw every reasonable factual inference in favor of the complainant.[20]

■ The defense of substantial truth may necessarily entail some inferential judgment concerning the importance of a falsity to the average reader. The notion of *substantial truth* necessarily implies a thread of untruth. The conclusion that a statement is substantially true will therefore involve the uncertain determination that whatever errors abound in the statement are irrelevant in the minds of the audience. In resolving the question of substantial truth against Ramunno, however, the Superior Court improperly drew a factual inference in the movant's favor, not in the pleader's favor as the court is constrained to do. Indeed, given the unavoidably inferential nature of this inquiry, it is a rare case that may be dismissed under Rule 12(b)(6) on the rationale that the statements complained of are substantially true.[21]

■ We turn now to the Superior Court's treatment of Cawley's statement that Ramunno has "done well through poorly maintained" properties. The Court held this to be non-actionable as a protected expression of opinion, applying the four-part test we adopted in *Riley* to determine whether a statement is one of fact or opinion.[22] We disagree with the Superior Court's conclusion. In our view, the holding attaches undue importance to the form in which Cawley cast his statement. A speaker may not insulate himself or herself from liability simply by phrasing defamatory statements as opinions where an imbedded defamatory fact may be inferred.[23]

■ It is generally true that courts are reluctant to impose liability for the expression of opinions.[24] But there is no wholesale exemption from defamation law for any statement cast in the form of an opinion.[25] Rather, a defamation action may lie where an opinion implies the existence of an undisclosed defamatory factual basis.

> An 'opinion may often imply an assertion of objective fact' and, if the implied fact may be found to be false the trier of fact may find the plaintiff to have been libeled.... Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such

19. *Riley,* 529 A.2d at 253; *accord West v. Thomson Newspapers,* Utah Supr., 872 P.2d 999, 1009 (1994) (decrying the "lexicographical approach" to interpreting allegedly defamatory statements).

20. *Solomon,* 672 A.2d at 38; *Grobow,* 539 A.2d at 187 n. 6.

21. *Compare Riley,* 529 A.2d at 253–54 (affirming grant of summary judgment against plaintiff in libel action); *Gannett Co.,* 496 A.2d at 557 (affirming grant of directed verdict against plaintiff in libel action).

22. *See Riley,* 529 A.2d at 251. The four factors are: common usage, objective verifiability, context, and social setting. *Id.; see also Ollman v.*

*Evans,* D.C.Cir., 750 F.2d 970, 979–85 (1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

23. *See Kanaga,* 687 A.2d at 177–78.

24. *See, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974) (under the First Amendment, there is "so such thing as a false idea").

25. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990); *Kanaga,* 687 A.2d at 177.

statements in terms of opinion does not dispel these implications ... [26]

By contrast, where a speaker makes explicit an underlying nondefamatory factual basis, a defamation action will fail without regard to how ridiculous or unjustified the opinion may be.[27]

▪ With respect to Cawley's statement that Ramunno has "done well through poorly maintained" properties, we hold that the grant of defendants' 12(b)(6) motion was in error. As in *Kanaga*, we find that the statement may suggest a defamatory factual basis not disclosed by the speaker. For instance, the phrase in question could imply that Ramunno has prospered from rents gleaned from dilapidated, sub-standard buildings, or that he has failed to observe governing building and health codes. What is crucial is that the average reader is unable to discern the source of the statement. Nothing in the letter signals to the audience that Cawley is surmising or reasoning from facts made explicit in the letter.[28] Readers are simply left to wonder what facts underlie Cawley's derogation of Ramunno's real estate portfolio. These circumstances, we feel, fall squarely within the scope of *Kanaga* and *Milkovich.*

In holding that Cawley's description of Ramunno's land holdings was substantially true, the Superior Court overstepped its role in the context of a 12(b)(6) motion to dismiss. The Court was obliged to draw all reasonable inferences in favor of the non-movant Ramunno, and in this respect it should have ruled that the errors in Cawley's description were potentially material to the average reader. And in finding that Cawley's claim that Ramunno has "done well through poorly maintained" properties is a non-actionable opinion, the Superior Court failed to recognize the potentially defamatory factual basis imbedded in the statement. In his complaint, then, Ramunno offers two statements on the part of the MBNA Defendants, both of which are actionable on their face. We therefore reverse this part of the Court's decision and remand with instructions to reinstate the libel claims against the MBNA Defendants.

### *The Libel Claims against the Gannett Defendants: The Newspaper Article and Headline*

▪ As with Ramunno's claims against the MBNA Defendants, the Superior Court dismissed Ramunno's complaint against the Gannett Defendants on the rationale that the statements in question—comprising the newspaper article of June 7, 1996, and its accompanying headline—were nonactionable. Indeed, its dismissal of the complaint as to the Gannett Defendants derived largely from its analysis of Cawley's letter. Because, for the most part, Barrish's article simply described statements contained in the letter—which, as noted, the Superior Court found nonactionable—the Court held that the article itself was not defamatory. But as to the Gannett Defendants, Ramunno's complaint also referred the Court to the headline, "MBNA chairman blasts landowner as slumlord." The Superior Court rejected Ramunno's argument that the headline was defamatory standing alone, and found that, when read in context with the entire article, the headline constitutes a protected expression of opinion. Once again, we disagree and reverse.

In *Reardon v. News–Journal Company* [29], we noted that "the sting of a libel may sometimes be contained ... in a headline to the body of [an] article, even though the facts are correctly set forth in the body." [30] We acknowledged as well that under other circumstances, it is appropriate to read the headline in full context—that is, in conjunction with the text of the body.[31] The *Reardon* Court declined to approve one approach to the ex-

---

**26.** *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. at 2705–06 (*quoted in Kanaga,* 687 A.2d at 177–78).

**27.** *Riley,* 529 A.2d at 254 (*cited in Kanaga,* 687 A.2d at 178).

**28.** *Compare Milkovich,* 497 U.S. at 36–37, 110 S.Ct. at 2714–15 (Brennan, J., dissenting).

**29.** Del.Supr., 164 A.2d 263 (1960).

**30.** *Id.* at 265.

**31.** *Id.*

clusion of the other,[32] and we adopt the same posture here. We need not reach Ramunno's claim that the headline itself is libelous, for we believe that reading the article and headline together makes clear that the complaint states a proper claim against the Gannett Defendants.

In large part, the article simply quotes verbatim from Cawley's letter and Ramunno's response thereto. But on two occasions, Barrish states that Ramunno owns 70 properties, without explaining that only one is currently occupied by a residential tenant. Barrish recounts Ramunno's indignant reaction to the letter, but does not explain that the source of his consternation is the error in Cawley's account of his landholdings. The article makes evident that Ramunno is the one who injected the term *slumlord* into the dispute, but Barrish does not make clear that Ramunno arrived at that conclusion in part because of inaccuracies in Cawley's letter. This may or may not seem trivial to the trier of fact, but it is the trier of fact that must make that determination.

■ We do not suggest that these omissions on Barrish's part render the article libelous by their own force. But when read in conjunction with the headline, which deploys the term *slumlord* in a most conspicu-

ous fashion, the article may convey the inaccurate impression that Ramunno does, in fact, own a sizable amount of sub-standard rental housing.[33] More disclosure of the underlying factual basis—including an exact description of Ramunno's real estate holdings—would shed light on Ramunno's reaction to Cawley's letter and cure the article's potentially defamatory character. But as it stands, the article and headline constitute statements actionable on their face in the context of all the allegations of the complaint, which must be accepted as true for purposes of the motion to dismiss.[34]

■ Of course, as to media defendants, it does not suffice simply to allege that a statement is false and defamatory. In *Kanaga*, we held that in a defamation action, a plaintiff must show at least negligence against a media defendant.[35] We find that Ramunno's complaint satisfies this standard. Ramunno alleged specifically that the MBNA Defendants knew that Cawley's letter was false, and that it was an attempt to portray Ramunno as a slumlord.[36] Ramunno's complaint thus satisfies the requirements of *Kanaga*, and it was error for the Superior Court to dismiss it for failure to state a claim on which relief can be granted.

---

32. *Id.*

33. The Superior Court itself concluded that, "[t]he headline was poorly chosen because read in context with the article it clearly is a distorted summary of what the Cawley letter really said and was apparently worded that way for its sensational effect." *Ramunno v. Cawley*, Del.Super., C.A. No. 96C–06–191, 1996 WL 812839 (Dec. 12, 1996), Op. and Order at 13.

34. We are not the first court to determine that *slumlord* is a charged term susceptible of a potentially defamatory meaning. On at least three occasions, courts in other jurisdictions have held that the term *slumlord* is outside the realm of protected opinion, and therefore may provide a proper basis for a libel action. *See Pisello v. Town of Brookhaven*, E.D.N.Y., 933 F.Supp. 202 (1996); *Near East Side Community Org. v. Hair*, Ind. Ct.App., 555 N.E.2d 1324 (1990); *Lal v. CBS, Inc.*, E.D. Pa., 551 F.Supp. 356 (1982), *aff'd*, 3d Cir., 726 F.2d 97 (1984). Again, in light of our holding in *Kanaga* that a statement cast as an opinion is actionable if it implies the existence of undisclosed defamatory facts, we caution

against an overly rigid application of the four-part *Riley* test. A statement is not a protected opinion simply because it contains "colorful language, catchy phrases or hyperbole." *See Clark v. Call–Chronicle*, Pa. Comm. Pleas, 16 Media L. Rep.2054, 2056 (1989).

35. 687 A.2d at 182 (citing *Gannett Co.*, 496 A.2d at 557).

36. The complaint alleges as well that the Gannett Defendants changed the headline very soon after its initial publication. According to the complaint, a later edition of Barrish's article ran under the headline, "MBNA chairman rips opponent of street closing." We recognize that this could be taken as an admission on the part of the Gannett Defendants, which further strengthens Ramunno's complaint in terms of the *Kanaga* requirement. Consideration of the headline change may run afoul of D.R.E. 407, which forbids evidence of subsequent remedial measures when offered to show negligent or culpable conduct. It is unnecessary to reach this question, for we hold that the complaint suffices to state a claim even without the aid of this allegation.

### The Libel Claim against Gannett Co.: The Cartoon

■ Although we disagree with much of the Superior Court's decision, we concur with its holding that the cartoon that appeared in *The News Journal* on June 11, 1996, constitutes a non-actionable opinion. As a general matter, the law looks disfavorably on libel suits premised on editorial cartoons.[37] Editorial cartoons have long played an important role in our nation's political discourse, and courts are fearful of the threat to free speech that could arise from the specter of tort liability. Also, readers would never reasonably interpret a cartoon as an assertion of objective fact.[38] "Cartoons are seldom vehicles by which facts are reported; quite the contrary, they are deliberate departures from reality designed forcefully, and sometimes viciously, to express opinion."[39]

The cartoon in this case certainly fits into this mold. *The News Journal*'s cartoonist was obviously using humor and hyperbole to place the dispute between Cawley and Ramunno in a satirical light. Moreover, it appeared in the opinion section of *The News Journal*, effectively dispelling the already slim possibility that the cartoon would be taken as a factual representation. It is therefore abundantly clear that the Superior Court was correct in dismissing this part of Ramunno's complaint.

### Civil Conspiracy Claim

■ The complaint alleged that the MBNA Defendants acted in conspiracy with the Gannett Defendants to defame plaintiff's character. The Superior Court dismissed this civil conspiracy claim as to both sets of defendants, on the rationale that the complaint failed to state a claim as to any underlying tort. We agree that civil conspiracy is not an independent cause of action in Delaware, and that it must arise from some underlying wrong.[40] We affirm the dismissal of Ramunno's civil conspiracy claim, notwithstanding our finding that Ramunno's complaint properly states a claim for libel.

■ The complaint fails to allege conduct on the part of defendants sufficient to constitute civil conspiracy. It alleges only that the defendants acted in conjunction with the aim of publishing a defamatory news story about Ramunno. Where First Amendment concerns are at issue, "proof of cooperation between ... individuals who have a common purpose to produce a news story does not represent a sufficient basis for an actionable conspiracy."[41] It is insufficient simply to allege facts constituting parallel conduct.[42] Rather, we hold that in the First Amendment context, a higher pleading standard is appropriate where the plaintiff asserts a claim for civil conspiracy. The complaint must set forth specific facts such as "meetings, conferences, telephone calls or joint signatures on written recommendations ... to indicate a conspiracy."[43] Ramunno failed to plead any such facts. We therefore affirm the dismissal of his civil conspiracy claim as to both sets of defendants.

### Conclusion

In partially reversing the Superior Court's dismissal of Ramunno's complaint, we express no view on the merits of his claims, and we intend no incursion on the First Amendment rights of the defendants. We rest our decision only on an application of traditional pleading doctrine to well-pleaded allegations as they appear on the face of the complaint. We find that the allegations, accepted as

---

37. See, e.g., *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *King v. Globe Newspaper Co.*, 400 Mass. 705, 512 N.E.2d 241 (1987), cert. denied, 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281, and cert. denied, 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988); *Wecht v. PG Publ'g Co.*, 353 Pa.Super. 493, 510 A.2d 769 (1986).

38. *King*, 512 N.E.2d at 244.

39. *Keller v. Miami Herald Publ'g Co.*, 11th Cir., 778 F.2d 711, 718 (1985).

40. *Connolly v. Labowitz*, Del.Super., 519 A.2d 138, 143 (1986).

41. *Dowd v. Calabrese*, D.D.C., 589 F.Supp. 1206, 1213 (1984).

42. See *Petula v. Mellody*, 138 Pa.Cmwlth. 411, 588 A.2d 103, 107 (1991).

43. *Id.*

true, state a claim for libel, but the perhaps dubious issue of whether a libel occurred as a factual matter or that actual damages resulted in this case must be determined on a developed factual record. In our view, reversal is necessary simply to preserve the integrity of our Rule 12(b)(6) jurisprudence. At the core of the jurisprudence lies the rule that dismissal is proper only where it appears with reasonable certainty that the non-movant could not recover under any conceivable state of facts inferable from the pleadings. In this case, the Superior Court fatally overstepped its mandate under Rule 12(b)(6).

Accordingly, we reverse the judgment of the Superior Court as to all of Ramunno's libel claims except that which he predicates on the cartoon. We affirm the dismissal as to the latter claim, as well as to Ramunno's allegations of civil conspiracy, and remand this action for further proceedings consistent with this Opinion.[44]

---

44. One would hope, however, that the parties would somehow resolve their differences in this unseemly dispute without burdening the courts further.