# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| THE DATA CENTERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: N15C-02-041 EMD CCLD |
| | ) | |
| 1743 HOLDINGS LLC and | ) | |
| UNIVERSITY OF DELAWARE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Submitted: July 17, 2015
Decided: October 27, 2015

*Upon Defendants 1743 Holdings LLC and University of Delaware's Motion to Dismiss.*
***DENIED IN PART/GRANTED IN PART***

Michael P. Kelly, Esquire, Andrew S. Dupre, Esquire, Christopher A. Selzer, Esquire, Benjamin A. Smyth, Esquire, McCarter & English LLP, Wilmington, Delaware, *Attorneys for Plaintiff The Data Centers, LLC*.

William E. Manning, Esquire, James D. Taylor, Jr., Esquire, Dawn Kurtz Crompton, Esquire, and Allison J. McCowan, Esquire, Saul Ewing LLP, Wilmington, Delaware, *Attorneys for Defendants 1743 Holdings LLC and University of Delaware*.

**DAVIS, J.**

### INTRODUCTION AND PROCEDURAL HISTORY

This is a civil action assigned to the Complex Commercial Litigation Division of the Court. The action involves the duties, rights and remedies of The Data Centers, LLC ("TDC"), 1743 Holdings LLC ("Holdings"), and the University of Delaware ("University" and, collectively with Holdings, "Defendants") with respect to a seventy-five-year Ground Lease Agreement ("Lease") and other related agreements. In this case, TDC alleges that Defendants

breached the Lease and other related agreements. TDC also claims that the Defendants acted in bad faith to frustrate TDC's construction and operation of a data center and power plant on Defendants' property after Defendants agreed to lease its property to TDC for such purposes. As a result of Defendants' conduct, TDC alleges multiple breaches of contract and tortious interference with prospective economic advantage. TDC asks the Court to award specific damages in the amount of at least $5 million, general damages, and exemplary and punitive damages.[1]

On February 4, 2015, TDC filed its Complaint ("Complaint") asserting five (5) claims, or counts, for relief against Defendants: (1) breach of contract against Holdings for breaching provisions of the Lease (Count I); (2) breach of the duty to indemnify as set forth in the Lease against Holdings (Count II); (3) breach of the implied covenant of good faith and fair dealing against Holdings (Count III); (4) breach of contract against the University for its failure to negotiate in good faith a Steam Sale Agreement (Count IV); and (5) tortious interference with prospective economic advantage against Defendants (Count V). Not including the exhibits, the Complaint is sixty-six (66) pages long and includes two hundred and fifty-seven (257) numbered paragraphs. TDC demanded a trial by jury on all counts in the Complaint.

On March 19, 2015, Defendants filed Defendants 1743 Holdings LLC's and University of Delaware's Opening Brief in Support of Their Motion to Dismiss (the "Motion"). Through the Motion, Defendants seek to enforce a liability limitation provision in the Lease.[2] Defendants also move to dismiss Counts II, III, IV, and V for failure to state a claim upon which relief can be granted.

---

[1] Compl. p. 66.
[2] *Id.*, Ex. A, Lease, § 14.1.

2

On April 20, 2015, TDC filed Plaintiff The Data Centers, LLC's Answering Brief in Opposition to Defendants 1743 Holdings LLC and University of Delaware's Motion to Dismiss (the "Response"). TDC argues that it is procedurally premature for the Court to enforce the liability limitation provision of the Lease. Further, TDC contends that the Complaint sufficiently pleads facts supporting Counts II, III, IV, and V.

On May 8, 2015, Defendants filed Defendants 1743 Holdings LLC's and University of Delaware's Reply Brief in Support of Their Motion to Dismiss (the "Reply"). Defendants argue that it is proper for the Court to rule on the applicability of the liability limitation provision at this stage in the litigation. Defendants also reassert their argument that the Complaint fails to state a claim for which relief can be granted in Counts II, III, IV, and V.

On July 17, 2015, the Court held a hearing on the Motion, the Response and the Reply. All parties appeared at the hearing. After considering the Motion, the Response, the Reply, and the arguments made at the hearing, the Court took the matter under advisement. This is the Court's decision on the Motion. As set forth below, the Court **GRANTS** the Motion with respect to dismissing Count II, but **DENIES** the Motion with respect to enforcing the liability limitation provision and with respect to dismissing Counts III, IV, and V.

## RELEVANT FACTS[3]

### A. The Project

Between 2010 and 2012, TDC investigated several competing locations for the construction and operation of a data center[4] and power plant to electrically power the center

---

[3] Unless otherwise indicated, the following are the Relevant Facts as alleged in the Complaint. For purposes of the Motion, the Court must view all well-pleaded facts alleged in the Complaint as true and in a light most favorable to TDC. *See, e.g.*, *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).

[4] The United States Environmental Protection Agency defines "data center" as:

> A facility housing electronic equipment used for data processing, data storage, and communications networking; Houses server, network, and computer equipment; May have

3

("Project").[5] In the course of TDC's investigation, "the STAR Campus" – a 272-acre parcel of land owned by Defendants[6] – became a candidate to host the Project.[7] In November 2012, after a competitive bidding process, TDC publicly announced its acceptance of Defendants' offer to host the Project.[8]

## B.    The Contracts

According to the Complaint, TDC – in order to facilitate the Project -- was to enter into three major contracts:  (1) the Lease with Holdings to provide land on which to build and operate the Project facilities; (2) the Power Purchase Agreement (the "PPA") with Delaware Municipal Electric Corporation ("DEMEC") to sell excess electricity produced by the power plant; and (3) the Steam Sale Agreement[9] with the University to sell excess steam generated by the Project to the University and its affiliates.[10] The University guaranteed that TDC would receive the Contracts if it selected the STAR Campus to host the Project.[11] Ultimately, TDC only fully executed the Lease with Holdings.

### 1.    The Lease

On December 14, 2012, Holdings and TDC executed the Lease providing an agreement between the parties for TDC to rent approximately 43 acres of the STAR Campus from Holdings

---

environmental controls; May contain or link to an uninterruptible, redundant and/or backup power supply; May be protected by physical security and protection devices or systems (*e.g.*, closed circuit monitoring, fire suppression); May be built for redundancy[.]
Compl. ¶ 26.
[5] *Id.*, ¶¶ 25, 30.
[6] TDC alleges that Holdings and the University are alter egos.  Compl., ¶ 11.  According to the Lease, the University is the parent of Holdings, and Holdings and the University partnered in order to attract TDC to the STAR Campus. *Id.*, Ex. A,, Lease at 1.
[7] *Id.*, ¶ 18, 30.
[8] *Id.* ¶ 73.
[9] The Steam Sale Agreement, the Lease and the PPA will be collectively referred to as the "Contracts."
[10] Compl. ¶ 74.
[11] *Id.* ¶ 75.

for a term of 75 years.[12] For purposes of the Motion, relevant sections of the Lease include Sections 11.2, 14.1 and 35.

Under Section 11.2 of the Lease:

Indemnification

Landlord agrees to indemnify, defend and hold harmless Tenant and any officer, director or member of Tenant, during the Term against and from all claims, losses (which shall not be limited to the loss or restriction of use of the Premises), liabilities, costs, actual damages or expenses (including reasonable attorney's, consultant's and expert fees and expenses actually incurred) but excluding consequential damages, directly or indirectly rising out of or attributable to any injury to any person (including death) or damage to any property which arise from Landlord's acts, omissions, negligence, willful misconduct or from the failure of the Landlord to keep, observe and perform any of the terms, covenants, conditions and provisions of this Lease to be kept, observed or performed by Landlord, unless the same is caused by the act or omission, negligent or intentional, of Tenant or Tenant's servants or employees. The provisions of this Section 11.2 shall be in addition to, but not in limitation of, the Environmental Indemnity.[13]

Under Section 14.1 of the Lease:

Tenant's Remedies and Limitations on Recourse

Notwithstanding anything to the contrary in this Lease, it is specifically understood and agreed that there shall be absolutely no personal recourse or liability for monetary damages on the part of the Landlord, its successors or assigns, with respect to any of the terms, covenants and conditions of this Lease in excess of the Landlord's equity in the Premises and the rents, issues and profits therefrom. Tenant agrees to look solely to the equity of Landlord in the Premises and the rents, issues and profits therefrom for the covenants and conditions of this Lease to be performed by Landlord, and no other property of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies. The provisions of this Section are not intended to limit Tenant's right to seek injunctive relief, declaratory judgments, specific performance nor to limit Tenant's right to claim proceeds of insurance or condemnation (if any) relating to the Premises. Such agreement is a primary consideration for the execution of this Lease by Landlord.[14]

Under Section 35 of the Lease:

Enforcement; Prevailing Party Entitled to Costs

---

[12] Compl. ¶ 76-78.
[13] Compl. Ex. A, Ground Lease Agreement § 11.2.
[14] *Id.* § 14.1.

5

If any party defaults under this Lease, the prevailing party shall be entitled to recover all reasonable fees and costs incurred in pursuing its remedies under this Lease, including but not limited to arbitration fees, attorneys' fees, court costs, and expert witness fees, all in addition to any other remedies or damages to which the non-defaulting party may be entitled. The term "prevailing party," as used herein, shall include without limitation, a party who obtains legal counsel and brings action against the other party by reason of the other party's breach or default and obtains substantially the relief sought, whether by compromise, settlement, or judgment after all rights or appeal have expired or been exhausted.[15]

## 2. The PPA

On December 17, 2012, DEMEC issued a formal Letter of Intent ("Electricity LOI") to negotiate the PPA.[16] Under the PPA, DEMEC was going to purchase up to 100% of the excess electricity generated by the Project.[17] DEMEC issued the Electricity LOI contemporaneously with the execution of the Lease, and TDC would not have signed the Lease without the Electricity LOI, according to the Complaint.[18]

Consistent with the Electricity LOI, TDC and DEMEC met several times in early 2013 to formalize their agreement to execute the PPA.[19] On April 18, 2013, TDC and DEMEC memorialized essential terms of an agreement for DEMEC to purchase electricity from TDC in a final term sheet ("PPA Term Sheet").[20] TDC presented DEMEC with a final version of the PPA in April 2014.[21] DEMEC never signed the PPA. TDC alleges that DEMEC did not execute the PPA because Defendants breached the Lease and terminated the Project.[22] TDC contends that Defendants' alleged breach of the Lease and DEMEC's failure to sign the PPA provide the basis for TDC's claim for tortious interference with prospective economic advantage.

---

[15] *Id.* § 35.
[16] *Id.*, ¶ 85.
[17] *Id.*
[18] *Id.,*. ¶ 85-86.
[19] *Id.*, ¶ 88.
[20] *Id.*, ¶ 89.
[21] *Id.*, ¶ 92.
[22] *Id.*, ¶ 93.

6

### 3.    Steam Sale Agreement

On December 14, 2012, the University issued a Letter of Interest (the "Steam LOI") expressing interest in purchasing steam generated by the Project.  According to the Complaint, TDC would not have signed the Lease without the Steam LOI, and "the University's promise to purchase steam from the Project was an important factor in the University's winning bid."[23]

Signed by the University's Director of Real Estate, the Steam LOI articulates the University's "support for the TDC Project located on the STAR Campus [and expresses] interest in seeing it developed to provide an option to purchase steam."[24]  Further, the Steam LOI expresses a "willing[ness] to enter into [an] agreement [to purchase steam] upon [Defendants] finalizing [their] financing and ground breaking for construction."[25]

In addition, the Lease creates an agreement between Defendants and TDC "to evaluate the opportunity for … [TDC] to provide steam capacity to the University."[26]

Between January and August 2013, TDC and the University negotiated the Steam Term Sheet.[27]  In August 2013, the parties met to further discuss the sale of steam energy.[28]  The meeting resulted in the Steam Term Sheet which included the following terms as negotiated by the parties:  (1) "Capacity Payment," (2) "Contract Consumption Volume," (3) "Consumption Payment," (4) "Consumption Rate," and (5) "Payment Terms."[29]

In late 2013, the University decided not to negotiate the Steam Sale Agreement any further as contemplated in the Steam LOI.[30]  In a letter dated April 23, 2014, Holdings' President

---

[23] *Id.*, ¶ 102.
[24] Compl., Ex. D.
[25] *Id.*
[26] *Id.*, Ex. A, Lease, §9.14.
[27] *Id.*, ¶ 241.
[28] *Id.*, Ex. N.
[29] *Id.*, Ex M.
[30] *Id.*, ¶ 245.

denied that the University intended to purchase steam from the TDC.[31] Negotiations ceased, and Defendants terminated the Project before the parties executed a final Steam Sale Agreement. The University's alleged failure to negotiate the Steam Sale Agreement in good faith provides, in part, the basis for TDC's breach of contract action against the University.

## C.      Defendants' Termination of the Project

In June 2014, a group of local citizens formed Newark Residents Against the Power Plant ("NRAPP") to oppose construction of the Project.[32] According to the Complaint, NRAPP took the position that all newly installed power generation capacity must be exclusively wind or solar powered.[33] NRAPP quickly grew and eventually numbered over 100 members.[34]

NRAPP sought to prevent construction of the Project in a variety of ways. First, it challenged the Project by alleging violations of zoning regulations.[35] Second, it attacked TDC's right to sell excess electricity to DEMEC.[36] Third, it pressured the University to breach the Lease by conducting a series of protest actions outside of classrooms and football games.[37]

Following NRAPP's opposition, the University began to distance itself from the Project. In communicating with the public, the University denied knowing that the Project included construction of a Combined Heat and Power ("CHP") Plant.[38] Specifically, in a letter dated April 23, 2014, the University denied ever promising to buy steam from the Project.[39]

In 2013 and early 2014, according to the Complaint, the University permitted Bloom Energy ("Bloom") to dump thousands of tons of construction debris onto TDC's Leasehold in

---

[31] *Id.*, Ex O.
[32] *Id.*, ¶ 126.
[33] *Id.*, ¶ 128.
[34] *Id.*, ¶ 127.
[35] *Id.*, ¶ 134
[36] *Id.*, ¶ 150.
[37] *Id.*, ¶ 160.
[38] *Id.*, ¶ 164.
[39] *Id.*, ¶ 175; Ex. O.

the course of constructing Bloom's facility on a neighboring tenancy.[40] On May 2, 2014, the University sent TDC a letter complaining that TDC was behind on construction milestones stated in the Lease, despite the University allowing Bloom to bury TDC's leasehold.[41]

In a letter dated July 10, 2014, Holdings terminated the Project and the Lease, giving rise to the current litigation between the parties.[42] As reasons for termination, Holdings cites TDC's failure to commence construction within the time limits contemplated by the Lease and the fact that TDC's use of the premises was not commensurate with a first class science and technology campus.[43]

## LEGAL STANDARD

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[44] However, the court must "ignore conclusory allegations that lack specific supporting factual allegations."[45]

## DISCUSSION

### A.    Liability Limitation Provision

In the Complaint, TDC claims it suffered damages of at least $200 million.[46] Defendants ask the Court to enforce Section 14.1 of the Lease which would limit any potential damages awarded to TDC under the Lease's Liability Limitation Provision. Section 14.1 provides that

---

[40] *Id.*, ¶ 179.
[41] *Id.*
[42] *Id.*, Ex. W.
[43] *Id.*
[44] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[45] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).
[46] Compl., ¶ 2.

there will be "absolutely no liability for monetary damages on the part of the Landlord . . . with respect to any of the terms, covenants and conditions of [the] Lease in excess of the Landlord's equity in the Premises, and the rents, issues and profits therefrom."[47]

Generally, the enforceability of liability limitation provisions should not be decided on the pleadings or on summary judgment.[48] Despite the Court's best efforts, it is unable to locate any case where a Delaware court enforced a purported limitation on damages upon a motion to dismiss. Moreover, at the hearing on the Motion, TDC demonstrated, to the Court's satisfaction, that enforcing Section 14.1, at this early stage of the proceedings, would be difficult given the language of Section 14.1 and the overall allegations made in the Complaint. Given this, the Court does not see any reason why it should depart from the general rule here. Therefore, the Court will enforce, or otherwise rule on, the applicability and enforceability of Section 14.1. Accordingly, the Motion is **DENIED**, without prejudice, with respect to limiting damages under Section 14.1.

### B.    Count II:  Indemnification

Next, Defendants ask the Court to dismiss Count II for failure to state a claim. In Count II of the Complaint, TDC seeks indemnification under Section 11.2 of the Lease for costs incurred in suing Defendants here. TDC argues that Section 11.2 is a first-party indemnification provision and contends that Holdings "owes an express contract duty… to make TDC whole for losses caused by Holdings' default."[49] The Court disagrees with TDC's interpretation of Section 11.2. The fair reading of Section 11.2 is that this section is a regularly utilized indemnification provision that requires Holdings, as the landlord, to indemnify, defend and hold harmless TDC

---

[47] *Id.,* Ex. A, Lease, § 14.1.
[48] *J.A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 543 (Del. Super. 1997).
[49] Compl., ¶ 222.

for injury to any person (including death) or damage to any property which arise from Holdings' conduct or lack of conduct in certain situations.

In apportioning attorney fees, Delaware follows the American Rule, which provides that parties must pay their own attorney fees.[50] "Indemnity agreements are presumed *not* to require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent."[51]

Although the indemnity provision here applies to "all claims," the Court does not consider this a clear and unequivocal articulation of intent to provide TDC with direct indemnity rights for claims brought against Defendants. Section 11.2 provides that the "Landlord agrees to indemnify, defend and hold harmless Tenant."[52] The Supreme Court of Iowa held that "an indemnification clause that uses the terms 'indemnify' and 'hold harmless' indicates an intent by the parties to protect a party from claims made by third parties rather than those brought by a party to the contract."[53] The Court agrees. Absent specific language showing intent to extend the protections of an indemnity provision to claims brought against parties to the contract, the Court will interpret the indemnity provision as applying to third party claims only.

Further, even if the Court did find that Section 11.2 created a right to first-party indemnification, the injuries alleged in the Complaint fall outside the scope of the injuries contemplated by the indemnification provision. Section 11.2 provides indemnification rights for damages "arising out of or attributable to any injury to any person (including death) or damage to any property."[54] TDC does not allege any personal injury or damage to any property in the

---

[50] *TranSched Sys. Ltd. v. Veryss Transit Solutions, LLC*, No. 07C-08-286, 2012 WL 1415466, at *1 (Del. Super. Mar. 29, 2012) (citing *Maurer v. International Re-Insurance Corp.*, 95 A.2d 827, 830 (Del. Ch. 1953)).
[51] *TranSched Systems Ltd.*, No. 07C-08-286, 2012 WL 1415466, at *2.
[52] Compl., Ex. A, Ground Lease Agreement § 11.2.
[53] *TranSched Systems Ltd.*, 2012 WL 1415466, at *1 (citing *Nevada Care, Inc. v. Dep't of Human Services*, 783 N.W.2d 459, 470-71 (Iowa 2010)).
[54] *Id.* § 11.2.

Complaint. Instead, TDC seeks recovery for economic loss as a result of Defendants' breach of the Lease. Therefore, Section 11.2 is inapplicable to TDC's claims.

Because Section 11.2 does not provide for first-party indemnification and applies only to damages arising from personal injury or property damage, TDC fails to state a claim upon which relief can be granted. Accordingly, as to Count II, the Motion is **GRANTED.**

**C.      Count III: Implied Covenant of Good Faith and Fair Dealing**

Defendants also move to dismiss Count III for failure to state a claim upon which relief can be granted. In Count III of the Complaint, TDC alleges that Defendants breached the implied covenant of good faith and fair dealing. TDC pleads Count III as an alternative to its breach of contract claim alleged in Count I.[55]

In Delaware, the implied covenant of good faith and fair dealing attaches to every contract and requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[56] Parties are liable for breaching the covenant when their conduct frustrates the "overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms.[57]

To state a claim for breach of the implied covenant of good faith and fair dealing, a party "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[58] General allegations of bad faith are not sufficient to survive a motion to dismiss; instead, TDC must allege a specific implied contractual

---

[55] Compl., ¶ 227.
[56] *Dunlap v. State Farm Fire And Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985)).
[57] *Dunlap*, 878 A.2d at 441 (citations omitted).
[58] *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Fitzgerald v. Cantor*, No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

12

obligation and allege how the violation of that obligation denied it the fruits of the Lease.[59]  Only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of, had they thought to negotiate with respect to that matter, may a party invoke the protections of the implied covenant of good faith and fair dealing.[60]

In *Kuroda v. SPJS Holdings, LLC*, the Chancery Court dismissed an implied covenant claim that was premised on the defendants' failure to pay money due under the contract.[61]  The court reasoned that the implied covenant may not be invoked to override express provisions of the contract which provided for the defendants' obligation to make payments.[62]  Similarly, in *Fortis*, the Chancery Court dismissed an implied covenant claim because the Complaint failed to identify an implied contractual term.[63]  In granting the motion to dismiss, the court held that the plaintiff's implied covenant claim duplicated its breach of contract claim because the factual basis for each claim was identical.[64]

The facts here are different from those in *Kuroda* and *Fortis*.  TDC does not invoke the implied covenant to override express provisions of the contract, nor does it fail to identify an implied contractual term different from the express terms of the contract.  TDC identifies an implied contractual obligation of Defendants to defend or, "at least silently meet its contractual obligations" with respect to the Project.[65]  TDC alleges that Defendants breached that obligation by acting in bad faith "with the intent of depriving TDC of the benefit of its bargain."[66] TDC supports such an allegation with specific examples of Defendants' acts of bad faith:

---

[59] *Kuroda*, 971 A.2d at 888.
[60] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (citing *Dunlap*, 878 A.2d at 442).
[61] *Id*.
[62] *Id*.
[63] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, No. 9522-CB, 2015 WL 401371, at *5 (Del. Ch. Jan. 30, 2015)
[64] *Id.* at *6.
[65] Compl. ¶ 234.
[66] *Id.,* ¶ 229.

(a) Defendants issued a knowingly-false statement to NRAPP (knowing that NRAPP would disseminate it to the public) in the April 23rd Letter that the University never had an agreement or intention to buy steam from TDC, and that University purchases of steam were not a basis of the Project, when in fact the University had signed the Steam LOI to do exactly that;

(b) The University authorized Bloom Energy to dump thousands of tons of construction debris onto the Leasehold, and then attempted to assert delayed construction as a basis for terminating the Lease, despite that the delay was caused solely by the University;

(c) Defendants falsely represented to the press and public that they misunderstood or were unaware of the size of the CHP Plant contemplated by the Project as authorized by the Lease. The University and its agents – at public hearings and in the press – repeatedly feigned ignorance of the details of the Project, implying that TDC had misled the University into signing the Lease. All such statements and representations were false and known to be false when made. The University and Holdings were fully aware of all Project details before signing the Lease, including the size of the CHP Plant; and,

(d) Other acts of bad faith that discovery shall reveal.[67]

TDC alleges that Defendants' conduct deprived it of the ability to complete the Project as contemplated by the Contracts, thus resulting in damages to TDC.[68]

Defendants argue that TDC fails to identify a gap in the contract which gives rise to an implied contractual obligation.[69] However, contractual gaps always exist because human negotiators and drafters lack perfect foresight, operate with limited resources, and practice their craft using the imprecise tool of language.[70] Here, arguably, the parties did not foresee a situation where protestors would mount a challenge to the Project. If they did, TDC could have insisted on an express provision requiring Defendants to support the Project in the face of opposition; otherwise TDC would not have signed the Lease. Therefore, a gap does exist in the

---

[67] *Id.,* ¶ 230.
[68] *Id.*, ¶ 234-235.
[69] Motion p. 15.
[70] *In re El Paso Pipeline Partner, L.P. Derivative Litigation*, No. 7141, 2014 WL 2768782, at *16 (Del. Ch. Jun. 12, 2014) (citing Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1476 (2005)).

contract which could give rise to Defendants' implied obligation to defend the Project. TDC alleges this obligation in the Complaint along with Defendants' breach of the obligation and resulting damages.

Accepting all facts pled in the Complaint as true and drawing all inferences in favor of TDC, the Court finds that TDC has sufficiently pled a claim for breach of the implied covenant of good faith and fair dealing. Accordingly, the Motion as to Count III is **DENIED.**

**D.     Count IV:   Breach of Duty to Negotiate in Good Faith**

Defendants next move to dismiss Count IV for failure to state a claim upon which relief can be granted. In Count IV of the Complaint, TDC alleges that the University breached its contractual obligation to negotiate a Steam Sale Agreement in good faith. Defendants contend that TDC fails to establish an obligation to negotiate the Steam Sale Agreement in good faith. The Court disagrees with Defendants' arguments for dismissal.

An express contractual obligation to negotiate in good faith is binding on the contracting parties.[71] "In Delaware the intention of the parties controls the creation of a good-faith duty to negotiate under a letter of intent."[72] This case involves a letter of interest rather than letter of intent; however, the Court finds that, as a general rule, the intention of the parties is the proper test for determining whether a duty to negotiate in good faith was created. The Court will look at the parties' outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, in determining the intent of the parties to a contract.[73]

In the Complaint, TDC refers to three documents relating to Count IV. First, the Steam LOI "reiterate[s] [Defendants'] support for the TDC Project and express[es] interest . . . in seeing

---

[71] *SIGA Technologies, Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 344 (Del. 2013).
[72] *Id.* at 345.
[73] *Gillenardo v. Connor Broadcasting Delaware Co.*, No. 98C-06-015, 2002 WL 991110, at *6 (Del. Super. Apr. 30, 2002).

15

it developed to provide an option to purchase steam."[74]  Further, the Steam LOI expresses a "willing[ness] to enter into [an] agreement" to purchase steam upon finalization of TDC's financing and the commencement of construction."[75]  The Steam LOI concludes with the following promise:  "We will work with you to complete due diligence, pricing mechanisms and documentation over the coming weeks and months."  Second, the Steam Term Sheet includes fundamental terms negotiated by the parties relating to the Steam Sale Agreement including:  (1) capacity payment, (2) contract consumption value, (3) consumption payment, (4) consumption rate, and (5) payment terms.  Third, Section 9.14 of the Lease provides:

> Tenant and Landlord agree to evaluate the opportunity for the Tenant to provide steam capacity to the University and to evaluate the requirements for installation of steam interconnection lines between the power plant and the University's existing steam plant.  Both the Tenant and the Landlord agree to pursue this option as the project design proceeds.[76]

Based on the express contractual language of the Steam LOI, the Steam Term Sheet, and the Lease, it is reasonably conceivable that the parties intended to create a mutual obligation to negotiate the Steam Sale Agreement in good faith.

Accepting all facts pled in the Complaint as true and drawing all inferences in favor of TDC, the Court finds that TDC has sufficiently pled the existence of an obligation to negotiate in good faith and a breach of that obligation which resulted in damages.  Accordingly, the Motion as to Count IV is **DENIED.**

E.      **Count V:  Tortious Interference with Prospective Economic Advantage**

Finally, Defendants move to dismiss Claim V for failure to state a claim upon which relief can be granted.  In Count V of the Complaint, TDC alleges that Defendants tortiously interfered with TDC's prospective business relationship with DEMEC.

---

[74] Compl., Ex. D.
[75] *Id.*
[76] *Id.*, Ex. A, Lease, § 9.14.

16

To establish a claim for tortious interference with prospective economic advantage, TDC must show: (1) the reasonable probability of a business opportunity; (2) the intentional interference by defendant with that opportunity; (3) proximate causation; and (4) damages.[77] Additionally, TDC must identify the parties and subject matter of the business opportunity to which it had a reasonable expectancy.[78]

First, TDC alleges that there was "a reasonable expectancy of a business relationship with DEMEC as embodied by the Electricity LOI, the PPA Term Sheet, and the PPA."[79] TDC identifies the subject matter of the relationship as an agreement between the parties for DEMEC to purchase up to 100% of the excess electricity generated by the Project.[80] Second, TDC contends that the University had knowledge of TDC's expectation and intentionally interfered with such an expectation as a way to undermine the Project.[81] Specifically, TDC alleges the following acts of interference:

(a) The University connived with NRAPP to create a "working group" to recommend whether the University should breach the Lease. NRAPP then used the "working group" process as a fulcrum *via* the Council Resolution to prevail upon DEMEC not to sign the PPA, which it otherwise intended to do.

(b) The University breached the Lease and terminated the Project, with the express knowledge that doing so would deprive TDC of its relationship with DEMEC.

(c) Other interferences as discovery will reveal.[82]

Third, TDC contends that such interference caused damages to TDC in the amount of the full net present value of the PPA.[83]

---

[77] *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981) (citations omitted).

[78] *Image Hair Solutions Medical Center v. Fox News Central Network, LLC*, No. N13C-05-077, 2013 WL 6917138, at *6 (Del. Super. Dec. 20, 2013) (citing *Wyshock v. Malekzada*, No. 91C-09-22, 1992 WL 148002, at *3 (Del. Super. June 10, 1992)).

[79] Compl. ¶ 254.

[80] *Id.,* ¶ 83-85.

[81] *Id.,* ¶ 255-256.

[82] *Id.,* ¶ 256.

Defendants contend that TDC fails to allege an act of interference.[84]  The Court

disagrees.  TDC pleads two specific acts of interference.  First, TDC alleges that Defendants

collaborated with NRAPP to undermine the PPA.[85]  Second, TDC alleges that Defendants

breached the Lease and terminated the Project, intentionally undercutting the relationship

between TDC and DEMEC.[86]

Accepting all facts pled in the Complaint as true and drawing all inferences in favor of

TDC, the Court finds that TDC has sufficiently pled a claim for a tortious interference with

prospective economic advantage.  Accordingly, the Motion as to Count V is **DENIED.**

CONCLUSION

The Court finds that it is procedurally premature to enforce the liability limitation

provision set forth in Section 14.1 of the Lease.  Accordingly, Defendants' request to limit

TDC's recovery potential according to Section 14.1 is **DENIED.**

The Court also finds that TDC fails to state a claim upon which relief can be granted for

indemnification against Holdings.  Therefore, the Motion with respect to Count II is

**GRANTED**.

---

[83] *Id.*, ¶ 257.
[84] Resp. at 11.
[85] *Id.*, ¶ 155, 257.
[86] *Id.*, ¶ 256.

Finally, the Court finds that TDC has sufficiently pled claims for breach of the implied covenant of good faith and fair dealing against Holdings, breach of the contractual duty to negotiate in good faith against the University, and tortious interference with prospective economic advantage against Defendants.  Therefore, the Motion with respect to Count III, IV, and V is **DENIED.**

Dated: October 27, 2015
Wilmington, Delaware

/s/ *Eric M. Davis*
Eric M. Davis, Judge