# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| BRIGHTSTAR CORP., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. N18C-10-250 PRW CCLD |
| | ) | |
| PCS WIRELESS, LLC, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |
| | ) | |

Submitted: June 25, 2019
Decided: August 7, 2019

*Upon Defendant/Counterclaim Plaintiff PCS Wireless, LLC's
Motion to Dismiss Count II of the Complaint,*
**GRANTED**.

*Upon Plaintiff/Counterclaim Defendant Brightstar, Corp.'s
Motion to Dismiss Counts I and III of the Counterclaims,*
**GRANTED** in part; **DENIED** in part.

## MEMORANDUM OPINION AND ORDER

Thomas E. Hanson, Jr., Esquire (argued), Barnes & Thornburg, LLP, Wilmington, Delaware, Mark L. Durbin, Esquire (*pro hac vice*) (argued), Barnes & Thornburg, LLP, Chicago, Illinois, Attorneys for Plaintiff/Counterclaim Defendant.

Jonathan A. Choa, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware, Sean M. Douglass, Esquire (*pro hac vice*) (argued), Joseph M. Terry, Esquire (*pro hac vice*) (argued), Williams & Connolly, LLP, Washington, District of Columbia, Attorneys for Defendant/Counterclaim Plaintiff.

**WALLACE, J.**

## I.   INTRODUCTION

Plaintiff Brightstar Corporation brings this action against Defendant PCS Wireless, LLC for claims arising from a June 1, 2016 Mutual Non-Disclosure Agreement (the "NDA") and a November 7, 2016 Buy/Sell Agreement, as amended (the "Buy/Sell Agreement"), that Brightstar and PCS entered into as part of negotiations for a proposed strategic alliance and potential merger. In its Complaint, Brightstar brings one count each of breach of contract and misappropriation of trade secrets, through which it seeks, *inter alia*, compensatory and exemplary damages.

PCS answered the Complaint and brings against Brightstar five counterclaims: Counterclaim I – alleging fraud; Counterclaim II – alleging breach of contract (in the alternative to Counterclaim I); Counterclaim III – alleging breach of the implied covenant of good faith and fair dealing (in the alternative to Counterclaims I and II); Counterclaim IV – alleging misappropriation of trade secrets; and Counterclaim V – alleging a separate breach of contract.

Now before the Court is PCS's Motion to Dismiss Count II (misappropriation of trade secrets) of Brightstar's Complaint and Brightstar's Motion to Dismiss PCS's Counterclaims I (fraud) and III (breach of the covenant of good faith and fair dealing).

For the reasons explained below, the Court **GRANTS** PCS's Motion. As to Brightstar's Motion, it is **GRANTED**, in part, and **DENIED**, in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. FACTUAL BACKGROUND OF THE ACTION.

Brightstar is a Delaware corporation with its principal place of business in Miami, Florida, and is one of the largest subsidiaries of Japanese-based conglomerate SoftBank Group.[2] Brightstar is in the business of distributing wireless equipment and does so primarily using a "Buy-Back and Trade-In" model ("BBTI").[3]

PCS is a New Jersey limited liability company headquartered in Florham, New Jersey.[4] Ben Nash is PCS's chief executive officer, co-founder, and controlling shareholder.[5] Brightstar and PCS are leaders and competitors in the industry of distributing new and pre-owned smartphones and other mobile devices.[6]

---

[1] The Court summarizes here only the factual background pertinent to this motion. The Court extracts this background from the undisputed facts found in Brightstar's Complaint and PCS's Answer and Counterclaims. The Court notes differences in factual allegations wherever applicable.

[2] Def. PCS Wireless, LLC's Countercls. ¶¶ 13, 18 (Nov. 26, 2018) (D.I. 13) [hereinafter, "Countercls."].

[3] Pl. Brightstar Corp.'s Compl. ¶ 16 (Oct. 22, 2018) (D.I. 1) [hereinafter, "Compl."]; Countercls. ¶ 19.

[4] Countercls. ¶ 12.

[5] Compl. ¶ 18; Countercls. ¶ 19.

[6] Compl. ¶¶ 16–17; Countercls. ¶¶ 1, 17–18.

In 2016, Brightstar and PCS started to discuss a potential merger of the companies.[7] As their negotiations progressed, the parties entered into the NDA on June 1, 2016,[8] then the Buy/Sell Agreement on November 7, 2016 (reinstated and amended on June 1, 2017).[9] The Buy/Sell Agreement, in particular, memorialized the terms under which PCS would purchase various used mobile devices from Brightstar and Brightstar-approved vendors for resale to third-parties.[10] The terms most relevant to the present case include the pricing, confidentiality, and non-circumvention provisions.

Specifically, the pricing terms provide that PCS will purchase mobile devices from Brightstar at Brightstar's cost of acquiring those devices plus a predetermined markup.[11] The confidentiality provision requires each party and its affiliates to

---

[7]     Countercls. ¶ 1; Brightstar's Reply to Countercls. and Affirmative Defenses at 1 (December 12, 2018) (D.I. 18) [hereinafter, "Brightstar Resp."].

[8]     Countercls. ¶ 1; Brightstar Resp. at 1. *See also* Ex. 1 to Countercls. (Mutual Non-Disclosure Agreement) [hereinafter, "NDA"].

[9]     The Buy/Sell Agreement entered into on November 7, 2016 was terminated by PCS on January 19, 2017. On June 1, 2017, Brightstar and PCS executed a Reinstatement and First Amendment Agreement (the "Amended Agreement") to reinstate and amend the initial Buy/Sell Agreement. After entering into the Amended Agreement, the parties executed addition amendments to the original Buy/Sell Agreement on September 26, 2017, and November 7, 2017. For ease of reference, the Court uses the term "Buy/Sell Agreement" to refer to the terms and provisions as amended, and provides, if necessary, whether the referenced provisions are from the initial Buy/Sell Agreement or its amendments thereof. *See* Compl. ¶ 19; Countercls. ¶ 1. *See also* Ex. 2 to Countercls. (Buy/Sell Agreement) [hereinafter, "Buy/Sell Agreement"]; Ex. 3 to Countercls. (Reinstatement and First Amendment to the Buy/Sell Agreement).

[10]    Buy/Sell Agreement Recitals, § I Definitions (Approved Vendors).

[11]    *Id.* § II.

"maintain in strict confidence" the Confidential Information (as defined in the Buy/Sell Agreement).[12] The non-circumvention provision imposes upon PCS a non-solicitation obligation that during the term of the Buy/Sell Agreement and for a certain period thereafter, PCS shall not solicit the purchase of mobile and iPad devices from the suppliers specified in the Buy/Sell Agreement (including SoftBank, Apple Inc., and their affiliated entities).[13]

During 2016 and 2017, PCS purchased mobile devices from Brightstar under the Buy/Sell Agreement.[14] Ultimately, the merger contemplated between PCS and Brightstar did not come to fruition.[15] On February 12, 2018, PCS terminated the Buy/Sell Agreement via written notice to Brightstar.[16] After the termination, PCS made three payments to Brightstar in May and June of 2018 totalling about $6 million. This was purportedly to pay for devices PCS purchased pre-termination.[17]

---

[12]     *Id.* § IX.

[13]     *Id.* § IV.H; Amended Agreement Art. IV.H.

[14]     PCS alleges that it purchased 1,862,284 mobile devices from Brightstar at a cost of $469,508,751.44.   Countercls. ¶¶ 3, 36.   Brightstar contends that the parties conducted transactions, but denies PCS's stated quantity and monetary value.  Brightstar Resp. ¶¶ 3, 36.

[15]     Countercls. ¶ 4.

[16]     *Id.* ¶ 38.

[17]     Compl. ¶ 31; Countercls. ¶ 8 (describing that in May of 2018, PCS paid "approximately $4.6 million to close out open invoices," and then "another $1.6 million for the inventory.").

Brightstar and PCS do not dispute the above facts. However, the parties do contest who is at fault and for what conduct. Brightstar alleges that PCS still owes Brightstar an amount in excess of $10 million for the mobile devices purchased from Brightstar before PCS terminated the Buy/Sell Agreement.[18] Brightstar further alleges that PCS solicited the purchase of mobile devices from restricted vendors in violation of the non-circumvention and confidentiality provisions of the Buy/Sell Agreement.[19]

PCS denies any further payment obligation to Brightstar. Instead, PCS brings several counterclaims against Brightstar. PCS says Brightstar fraudulently inflated invoices issued to PCS causing PCS to overpay millions of dollars to Brightstar.[20] PCS further claims that Brightstar has improperly used PCS's confidential information—specifically, PCS's product grading system and other commercially valuable information.[21]

## B. PROCEDURAL BACKGROUND OF THE ACTION.

This action is not the first attempt at resolving Brighstar and PCS's payment dispute. Brightstar first filed an action in the District Court of Delaware against PCS

---

[18]     Compl. ¶¶ 34, 41.

[19]     *Id.* at 40.

[20]     Countercls. ¶¶ 70, 73–74.

[21]     *Id.* ¶¶ 94–99.

and Nash on July 6, 2018.[22] Brightstar voluntarily dismissed the action for failure to establish diversity because Nash—the beneficial owner of PCS—was a resident of Florida and Brightstar has its principal place of business in Florida.[23] Following dismissal in the federal court, Brightstar and PCS attempted two unsuccessful mediations on October 9 and 22, 2018. Then this action ensued.[24]

Now before the Court are the parties' cross-motions to dismiss.

## II.    STANDARD OF REVIEW

The standard of review on a motion to dismiss is derived from Superior Court Civil Rule 12(b)(6), which provides that a respondent may bring a motion to dismiss if the claimant fails "to state a claim upon which relief can be granted."[25]   In considering a motion to dismiss, the Court must:

> (1)   accept all well pleaded factual allegations as true,
>
> (2)   accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim,
>
> (3)   draw all reasonable inferences in favor of the non-moving party, and

---

22      Compl. ¶ 10.

23      *Id.* ¶¶ 12–14; Countercls. ¶¶ 12–14.

24      Compl. ¶ 15; Countercls. ¶ 15.

25      Del. Super. Ct. Civ. R. 12(b)(6).

(4)   [not dismiss the claims] unless the [claimant] would not be entitled to recover under any reasonably conceivable set of circumstances.[26]

However, the Court "is not required to accept every strained interpretation of the allegations proposed by the [claimant]."[27] The Court should "ignore conclusory allegations that lack specific supporting factual allegations."[28] The Court also may not consider extrinsic materials on a motion to dismiss except "where an extrinsic document is integral to a plaintiff's claim and is incorporated into the complaint by reference[.]"[29]

Dismissal is warranted when a party either fails to plead facts supporting an element of its claim (or counterclaim), or where under no reasonable interpretation of the facts alleged could its complaint (or answer) be read to state a claim (or

---

[26]   *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[27]   *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[28]   *Anderson v. Tingle*, 2011 WL 3654531, at *2 (Del. Super. Ct. Aug. 15, 2011) (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[29]   *Furman v. Delaware Dep't of Transp.*, 30 A.3d 771, 774 (Del. 2011). *See also Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013), *as corrected* (Oct. 8, 2013); *Price v. Koski Trucking, Inc.*, 2012 WL 3549729, at *2 (Del. Super. Ct. July 27, 2012); *Capano v. Lockwood*, 2015 WL 5178388, at *2 (Del. Super. Ct. Aug. 21, 2015). The Court notices that Brightstar does not attach a copy of the Buy/Sell Agreement to its Complaint. The Court relies on the copy provided by PCS as attached to PCS's Counterclaims, thus, extrinsic to Brightstar's allegations. Because the Buy/Sell Agreement is integral to Brightstar's claims asserted here and is incorporated in its Complaint by reference, the Court finds it appropriate to consider the Buy/Sell Agreement provided by PCS that is "extrinsic" to Brightstar's Complaint.

-7-

counterclaim) for which relief might be granted.[30] If the Court engages these well-accepted standards and finds the claimant (or counter-claimant) may recover, the Court must deny the motion to dismiss.[31]

## III. DISCUSSION

### A. PCS's MOTION TO DISMISS COUNT II (MISAPPROPRIATION OF TRADE SECRETS) OF BRIGHTSTAR'S COMPLAINT.

In Count II, Brightstar asserts a claim for misappropriation of a trade secret under the Delaware Uniform Trade Secrets Act.[32] According to Brightstar, the trade secret in question is "confidential information" as defined in the Buy/Sell Agreement, including, without limitation, "information regarding the price Brightstar would pay for products."[33] Brightstar claims that "PCS misappropriated Birghtstar's pricing information and used it to solicit business from Brightstar's suppliers."[34]

To survive a motion to dismiss a DUTSA claim under Rule 12(b)(6), the complaint must plead four elements:

      (i)    A trade secret exists;

---

[30] *Otto's Candies, LLC v. KPMG, LLP*, 2018 WL 1960344, at \*3 (Del. Super. Ct. Apr. 25, 2018).

[31] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

[32] DEL. CODE ANN. tit. 6, c. 20 (2016).

[33] Compl. ¶ 44.

[34] *Id.* ¶ 35.

(ii)     The plaintiff communicated the trade secret to the defendant;

(iii)    The communication was made pursuant to an express or implied understanding that the defendant would maintain the secrecy of the information; and

(iv)     The trade secret has been misappropriated within the meaning of that term as defined in the DUTSA.[35]

PCS moves for dismissal of Count II, contending that Brightstar failed to successfully allege two of the elements required to state a DUTSA claim: (1) the existence of a Brightstar trade secret[36] and (2) alleged misappropriation by PCS.[37]

To survive dismissal under Delaware's notice pleading standard,[38] "a plaintiff need not plead evidence," but at a minimum, must "allege facts that if true, state a claim upon which relief can be granted."[39] "An allegation, though vague or lacking in detail, is nevertheless 'well-pleaded' if it puts the opposing party on notice of the claim being brought against it."[40]

---

[35]     *Alarm.com Holdings, Inc. v. ABS Capital Partners Inc.*, 2018 WL 3006118, at *7 (Del. Ch. June 15, 2018) (citing *Wayman Fire Protection, Inc. v. Premium Fire & Security, LLC*, 2014 WL 897223, at *13 (Del. Ch. Mar. 5, 2014)).

[36]     Def./Countercl. Pl.'s Opening Br. in Supp. of its Mot. to Dismiss Count II of the Compl. at 5–10 (Nov. 26. 2018) (D.I. 15) [hereinafter, "PCS's Br."].

[37]     *Id.* at 10–13.

[38]     *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) ("Delaware is a notice pleading jurisdiction.").

[39]     *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).

[40]     *Id.* at 610-11.

### 1. Brightstar Sufficiently Alleges the Existence of a Trade Secret.

To make out a DUTSA misappropriation of trade secrets claim, the claimant first must show the subject information qualifies as a "trade secret." DUTSA defines "trade secret" as "information" that:

> a. derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[41]

Thus, to be considered a trade secret, information must: (1) not be generally known or readily ascertainable; (2) derive independent economic value from not being generally known or readily ascertainable; and (3) be subject to reasonable efforts to maintain its secrecy.[42]

PCS argues that Brightstar fails to adequately allege the existence of a trade secret because: (1) the prices Brightstar would pay for products cannot be Brightstar's trade secrets since Brightstar itself derived no independent economic

---

[41]    DEL. ANN. CODE tit. 6, § 2001(4).

[42]    *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 589 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010); *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *3 (Del. Super. Ct. Apr. 24, 2001) (quoting *Wilmington Trust Co. v. Consistent Asset Managment Co.*, 1987 WL 8459, at *3 (Del. Ch. Mar. 25, 1987)), *aff'd*, 812 A.2d 894 (Del. 2002) (noting that a trade secret exists when "the statutory elements—commercial utility arising from secrecy and reasonable steps to maintain secrecy [have] been shown.").

value from its secrecy;[43] (2) Brightstar fails to allege that the prices paid to its suppliers were actually kept secret by its suppliers;[44] and (3) Brightstar's Complaint contains insufficient details of what pricing information it considers to be a trade secret.[45] While Brightstar responds that it has alleged sufficient facts under the notice pleading standard to demonstrate that its pricing information can be considered a trade secret.[46]

Brightstar's Complaint sufficiently alleges the three elements required to establish the existence of a trade secret under the liberal notice pleading standards governing this motion.[47]

### a. Brightstar Sufficiently Alleges its Pricing Information is Not Generally Known or Ascertainable Through Other Means.

To be considered a trade secret, information must not be "known to, and not be[] readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."[48] Brightstar says it "maintains its pricing

---

[43] PCS's Br. at 6–7.

[44] *Id.* at 9–10.

[45] *Id.*

[46] Pl./Countercl. Def.'s Answering Br. in Opp'n to Def./Countercl. Pl.'s Mot. to Dismiss Count II of the Compl. at 10–14 (Jan. 2, 2019) (D.I. 24) [hereinafter, "Brightstar's Opp'n."].

[47] *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002).

[48] DEL. ANN. CODE tit. 6, § 2001(4).

information as confidential, stored it in a password protected system, and limited its disclosure only to those with a need to know who are subject to confidentiality agreements."[49] Also, Brightstar points out, the pricing information is "not generally known, not available on the Internet, and not otherwise available to the public."[50]

On this motion to dismiss, the Court must accept Brightstar's allegations as true,[51] and draw reasonable inferences in its favor.[52] Brightstar's allegations demonstrate that the pricing information is securely stored, disclosed on a need-to-know basis and revealed only to those who are subject to certain confidentiality arrangements. These assertions alone illustrate that the pricing information is not generally known or readily ascertainable by the public at large.

PCS contends that the pricing information is not secret because Brightstar gives it to suppliers in the course of business negotiations and fails here to demonstrate any control over those supplier's ability to publicize it.[53] That's it; that's really the sum of PCS's no-secret argument. And it falls short here.

---

[49] Compl. ¶ 46.

[50] *Id.*

[51] *Central Mortg.*, 27 A.3d at 535.

[52] *Id.*

[53] PCS's Br. at 7–9; Def./Countercl. Pl.'s Reply Br. in Supp. of Its Mot. to Dismiss Count II of the Compl. at 4 (Feb. 1, 2019) (D.I. 29) ("Brightstar has not alleged that it enforces or can prevent other parties—including its suppliers—from disclosing the prices it has paid for products[.]").

According to its Complaint, Brightstar's pricing information is disclosed only to third parties "with a need to know" it and "who are subject to confidentiality agreements."[54] With this insistence of such an agreement as a precursor to disclosure, the Court finds it reasonable to infer that Brightstar's suppliers are subject to confidentiality obligations with respect to the pricing information in question and are otherwise not free to publicize it in a manner that would make it generally known or ascertainable by others.

### b. Brightstar Sufficiently Alleges its Pricing Information has Independent Economic Value.

Now "[n]ot all confidential information is a trade secret."[55] To be considered a trade secret, information must "[d]erive[] independent economic value" from its secrecy.[56] In the context of sophisticated commercial transactions, a fact-intensive analysis of the economic activities at play may be required to determine both whether

---

[54] Compl. ¶ 46.

[55] *EDIX Media Group, Inc. v. Mahani*, 2006 WL 3742595, at *5 (Del. Ch. Dec. 12, 2006).

[56] DEL. CODE ANN. tit. 6, § 2001(4) (2016). *See also Beard Research*, 8 A.3d at 589; *Atlantic Medical Specialists, LLC v. Gastroenterology Assocs., P.A.*, 2017 WL 1842899, at *9 (Del. Super. Ct. Apr. 20, 2017) ("We can think of this requirement as one that the 'secret' ... have *independent* economic value *because* it is a secret.") (emphasis in original).

-13-

protection is warranted[57] and the beneficiary of such protection.[58] The independent economic value requirement highlights DUTSA's purpose—mainly, to protect the "investment" behind "new marketing plans, chemical formulas, client lists, and other materials developed by a business only after the extension of considerable effort."[59] This Court has stressed the importance of protecting secrets that are the product of considerable effort.[60]

Brightstar claims trade secret protection for "certain confidential information, as that term is defined in the [Buy/Sell] Agreement, including, without limitation, information regarding the price Brightstar would pay for products."[61] The Buy/Sell Agreement defines "Confidential information" as follows:

> [A]ny proprietary, financial or other non-public information
> disclosed or made available by the other Party or its Affiliates
> in connection with this [Buy/Sell] Agreement, including any

---

[57] *See, e.g., Savor*, 2001 WL 541484, at *3 (holding that while a "rebate program" is not a novel idea and "[the program] is not in and of itself a 'trade secret'[,]" "[t]he process by which the rebate program might be implemented . . . may qualify for trade secret protection.").

[58] *See, e.g., Atlantic Medical Specialists*, 2017 WL 1842899, at *11 ("The insurance company may have a protectable trade secret interest in the reimbursement rates it pays physicians, but it does not follow that the physician likewise has one.").

[59] *Id.* at *9–10.

[60] *See id. See also EDIX Media Group*, 2006 WL 3742595, at *6 ("In determining whether a customer list qualifies as a trade secret, this Court places great weight upon whether competitors could assemble a similar list through information in the public domain without a similar expenditure of time and money. Where such assembly would be difficult or impossible, trade secret protection may be appropriate, but where customers in a particular industry can be easily identified, their identity is less likely to be a trade secret[.]").

[61] Compl. ¶ 44.

financial information, pricing information, marketing plans, business plans and customer lists of such other Party hereto. For clarity, the contact and other information regarding any Supplier or its Affiliates provided by Brightstar to PCS shall be Confidential Information of Brightstar hereunder.[62]

PCS contends that "pricing information" is vaguely plead and refers solely to "the price Brightstar would pay for products."[63] According to PCS, the price Brightstar pays to its suppliers derives economic value to the suppliers, not Brightstar.[64] But "Brightstar does not allege that the general idea of *having* pricing information is a trade secret. Rather, [ ] [Brightstar contends its] overall pricing information and strategy – established over years in the market as one of the global leaders – is the trade secret."[65]

This is a motion to dismiss and so the Court must draw all reasonable inferences in favor of Brightstar as the non-moving party.[66] Under that standard the "pricing information" as plead in Brightstar's Complaint represents more than just the price Brightstar paid suppliers for its products; it includes the strategy behind Brightstar's pricing scheme. Seeing as though Brightstar and PCS are both in the

---

[62]     Buy/Sell Agreement §IX.

[63]     PCS's Br. at 6–7.

[64]     *Id.*

[65]     Brightstar's Opp'n at 14.

[66]     *Central Mortg.*, 27 A.3d at 535.

business of buying and selling new and used electronic devices,[67] Brightstar's pricing information and the underlying strategy could very well encompass some of "the competitive advantage that [Brightstar] ha[s] in the marketplace."[68] Brightstar alleges that "[i]f a competitor obtained Brightstar's pricing information, it could use that information to undercut Brightstar in negotiating agreements with existing and new suppliers, thereby avoiding the need to invest significant time and resources into gathering pricing data for the industry or establishing a relationship with the suppliers."[69] This concern embodies the type of "investment in the business, the ideas, the effort and time spent by the business in developing it"[70] that DUTSA was designed to protect. So Brightstar sufficiently alleged its pricing information has independent economic value by being kept secret.

### c. Brightstar Sufficiently Alleges it Undertook Reasonable Efforts to Maintain the Secrecy of the Pricing Information.

To qualify as a trade secret, the holder of protected information must undertake efforts "reasonable under the circumstances to maintain its secrecy."[71]

---

[67] Compl. ¶¶ 16, 17.

[68] Transcript of Oral Argument at 15, *Brightstar Corp. v. PCS Wireless, LLC*, N18C-10-250 PRW CCLD (Jun. 25, 2019) (D.I. 48).

[69] Compl. ¶ 48.

[70] *Atlantic Medical Specialists*, 2017 WL 1842899, at *9–10.

[71] DEL. CODE ANN. tit. 6, § 2001(4).

The reasonable efforts requirement "is not a high bar."[72] "Bare legally conclusive assertions are inadequate; confidentiality provisions or policies intended to prevent unauthorized disclosure are sufficient."[73]

As mentioned before, Brightstar's Complaint alleges that it "maintained its pricing information as confidential, stored it in a password protected system, and limited its disclosure only to those with a need to know who are subject to confidentiality."[74] Accepting these allegations as true,[75] Brightstar's use of secured storage methods and insistence on disclosing the pricing information only to those

---

[72] *GWO Litigation Trust v. Sprint Solutions, Inc.*, 2018 WL 5309477, at *10 (Del. Super. Ct. Oct. 25, 2018).

[73] *Id. Accord MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *14 (Del. Ch. May 10, 2018) (holding that the allegations are insufficient where the plaintiff simply alleged "[plaintiff] made efforts to maintain the secrecy of the [i]nformation, and these efforts were reasonable under the circumstances."); *Wayman Fire Protection*, 2014 WL 897223, at *15 (observing that "[i]n prior trade secrets cases . . . This Court [ ] has found that reasonable efforts were taken to preserve confidentiality when a company had implemented specific policies to prevent disclosure of information to outsiders or the company was in an industry where custom dictated that certain information be kept confidential.").

[74] Compl. ¶ 46. The parties also entered into the NDA a few months prior to executing the Buy/Sell Agreement. *See* Countercls. ¶ 1; NDA. Curiously, Brightstar's allegation makes no mention of the NDA. The NDA is only referenced in, and annexed to, PCS's Counterclaims. Thus, for purposes of PCS's motion to dismiss, the Court must only consider Brightstar's allegations and the extrinsic documents integral to and incorporated in its complaint. Given that no reference is made to the NDA by Brightstar in its Complaint, the Court does not consider the NDA as Brightstar's "reasonable effort" undertaken to ensure the pricing information remains confidential.

[75] *Central Mortg.*, 27 A.3d at 535.

-17-

who agree to be bound by a confidentiality agreement demonstrates that Brightstar undertook sufficiently reasonable measures to keep the information secret.

## 2. Brightstar Fails to Plead Facts in Support of Misappropriation by PCS.

Having found that Brightstar has sufficiently alleged the existence of a trade secret, the Court must now consider whether Birghtstar adequately plead facts demonstrating that PCS engaged in any misappropriation of Brightstar's pricing information.

To make out a DUTSA trade secret misappropriation claim, the claimant also must plead facts sufficient to demonstrate "misappropriation" by the defendant. Under DUTSA, "misappropriation" is defined, in relevant part, as:

    a.    Acquisition of a trade secret of another by a person who knows or has reason to know that the secret was acquired by improper means; or

    b.    Disclosure or use of a trade secret of another without express or implied consent by a person who:

        1.    Used improper means to acquire knowledge of the trade secret; or

        2.    At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade was:

            A.    Derived from or through a person who had utilized improper means to acquire it;

            B.    Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . .[76]

On a motion to dismiss, the Court accepts as true all well-pleaded allegations,[77] and draws all factual inferences in favor of the non-moving party.[78] But, the Court need not accept "conclusory allegations that lack specific supporting factual allegations."[79] A complaint relying exclusively on "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice."[80]

Brightstar's Complaint asserts only that "PCS misappropriated Brightstar's pricing information and used it to solicit business from Brightstar's suppliers."[81] It is otherwise devoid of any specific details suggesting how PCS impermissibly used the pricing information. Without any supporting factual allegation whatsoever,

---

[76]  *Savor*, 2001 WL 541484, at *2–3 (citing DEL. CODE ANN. tit. 6, § 2001(2)).

[77]  *Central Mortg.*, 27 A.3d at 535.

[78]  *Id.* at 356; *Ramunno*, 705 A.2d at 1036 (the court must "draw every reasonable factual inference in favor of the complainant.") *See, e.g., Washington v. William H. Porter, Inc.*, 2017 WL 3098210, at *5 (Del. Super. Ct. July 20, 2017); *Doe v. Cedars Academy, LLC*, 2010 WL 5825343, at *3 (Del. Super. Ct. Oct. 27, 2010); *Wilmington Sav. Fund Soc'y, FSB v. Anderson, et al.*, 2009 WL 597268, at *2 (Del. Super. Ct. Mar. 9, 2009) (citing *Doe v. Cahill*, 884 A.2d at 458)).

[79]  *Anderson v. Tingle*, 2011 WL 3654531, at *2 (quoting *Ramunno*, 705 A.2d at 1034).

[80]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[81]  Compl. ¶ 35.

Brightstar's suggestions of misappropriation are precisely the type of legal conclusions and threadbare recitals of the elements of a cause of action that fail to put the opposing party on notice of the claim being brought against it.

PCS's motion to dismiss Brightstar's Count II—misappropriation of trade secrets—is **GRANTED.**

### B. BRIGHTSTAR'S MOTION TO DISMISS COUNTERCLAIMS I (FRAUD) AND III (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING).

#### 1. Counterclaim I—Fraud.

In Counterclaim I, PCS alleges fraud; PCS contends that Brightstar "made false and fraudulent representations to PCS on all or nearly all of the invoices that Brightstar submitted to PCS under . . . [the Buy/Sell Agreement] by repeatedly inflating its 'Acquisition Cost' for devices sold to PCS."[82] Brightstar argues three grounds for dismissal of PCS's first counterclaim: (i) failure to satisfy the heightened pleading standard under the Superior Court Civil Rule 9(b);[83] (ii)

---

[82] Countercls. ¶¶ 69–76.

[83] Pl./Countercl. Def.'s Opening Br. in Supp. of its Mot to Dismiss Counts I and III of Def./Countercl. Pl.'s Countercls. at 1-2, 9-13 (Dec. 17, 2018) (D.I. 19) [hereinafter, "Brightstar's Br."].

preemption by the already-asserted contract claims;[84] and (iii) preclusion by Delaware's economic loss doctrine.[85]

To state a claim for fraud, one must allege: (1) a false representation, usually one of fact; (2) the defrauder's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the claimant to act or to refrain from acting; (4) the claimant's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the claimant as a result of such reliance.[86] A claim for fraud is subject to "a heightened particularity standard" under Superior Court Civil Rule 9(b).[87] "The factual circumstances that must be stated with particularity refer to the time, place, and contents of the factual representations; the facts misrepresented; the identity of the person(s) making the misrepresentations; and what that person(s) gained from making the misrepresentation."[88] When the necessary facts are typically within the opposing

---

[84]  *Id.* at 2, 13–15.

[85]  *Id.* at 2, 15–17.

[86]  *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)).

[87]  *Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *2 (Del. Super. Ct. June 27, 2016) (citing Super. Ct. Civ. R. 9(b)).

[88]  *Avve, Inc. v. Upstack Technologies, Inc.*, 2019 WL 1643752, at *5 (Del. Super. Ct. Apr. 12, 2019) (quoting *Trenwick American Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207-08 (Del. Ch. 2006), *aff'd sub nom. Trenwick American Litigation Trust v. Billett*, 2007 WL 2317768 (Del. Aug. 14, 2007)).

party's control, less particularity is required and the claim can prevail so long as the claimant describes the circumstances of fraud with "detail sufficient to apprise the defendant of the basis for the claim."[89]

PCS contends Brightstar "made false and fraudulent representations to PCS" in the form of emails and on at least 17 invoices purporting to state the "Acquisition Cost"[90] of at least one type of mobile device—the iPhone 6S Plus 64 GB.[91] Specifically, PCS alleges Brightstar's employees "and a rotating cast of executives" falsely inflated the price Brightstar paid suppliers and concealed discounts it received from suppliers for devices.[92] "PCS alleges that these misrepresentations were made throughout a three-month period immediately following execution of the first agreement (November 2016 through January 2017) and a roughly six-month period immediately following execution of the second agreement (June 2017 through December 2017)."[93] According to PCS, these price alterations created an

---

[89]     *CSH Theatres LLC v. Nederlander of San Francisco Associates*, 2015 WL 1839684, at *22 (Del. Ch. Apr. 21, 2015) (quoting *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch.2006)).

[90]     "Acquisition Cost" is defined in the Buy/Sell Agreement.

[91]     Countercls. ¶¶ 47-50, 70. PCS contends Brightstar had also been overcharging them for other I Phone models. It is PCS's belief that "discovery will demonstrate that Brightstar had been systematically overcharging PCS with respect to devices from multiple vendors." *Id.* at ¶ 55.

[92]     *Id.* at ¶¶ 9, 56.

[93]     Def./Countercl. Pl.'s Answering Br. in Opp'n to Pl./Countercl. Def.'s Mot. to Dismiss Counts I and II of the Countercls. at 13 (Jan. 17, 2019) (D.I. 25) [hereinafter, "PCS's Opp'n"].

-22-

artificially high up-front profit margin on devices sold to PCS and ensured PCS did not meet the target required for Brightstar to split the excess revenue with PCS upon resale.[94] Even if PCS did conceivably plead with sufficient particularity the who, what, where, when, and how of the fraud,[95] the underlying conduct is not separate and distinct from that constituting the alleged breach of contract such that the fraud claim can survive this motion to dismiss.

Delaware Superior Court Civil Rule 8(e)(2) allows a party to "set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses."[96] No doubt "[a] fraud claim can be based on representations found in a contract."[97] But "where an action is based entirely on a breach of the terms of a contract between the parties, and not on a

---

[94]  Countercls. ¶ 50 ("On information and belief, Brightstar made the misrepresentations to guarantee itself an artificially high up-front profit margin on all devices sold to PCS, and to ensure that PCS would be burdened with low profit margins for which it could only claim credits against future revenue-sharing payments – which only would occur if PCS resold the devices at more than twice Brightstar's artificially high margin.").

[95]  This Court's recent decision in *Avve, Inc. v. Upstack Technologies, Inc.* exposes at least one possible deficiency in PCS's fraud claim; that being, PCS's description of when the alleged fraudulent communications occurred. *See Avve, Inc.*, 2019 WL 1643752, at *7 (finding the timing description to be "imprecise" when plaintiff contended that defendant made false statements during the course of pre-contract email communications and meetings occurring over a six-month period).

[96]  *Ashland LLC v. Samuel J. Heyman 1981 Continuing Trust For Heyman*, 2018 WL 3084975, at *14 (Del. Super Ct. June 21, 2018) (internal quotations omitted).

[97]  *Id.* (quoting *ITW Global Investments Inc. v. American Industrial Partners Capital Fund IV, L.P.*, 2015 WL 3970908, at *6 (Del Super. Ct. June 24, 2015) (citing *Ameristar Casinos, Inc. v. Resorts Int'l Holdings, LLC*, 2010 WL 1875631, at *11 (Del. Ch. May 11, 2010)).

violation of an independent duty imposed by law, [one] must sue in contract and not in tort."[98] A fraud claim brought contemporaneously with a breach-of-contract claim might survive "so long as the claim is based on conduct that is separate and distinct from the conduct constituting breach."[99] Courts often focus on when the fraudulent conduct is alleged to have occurred.[100] And "[a]llegations related to the inducement to contract have been recognized as 'separate and distinct' conduct, while those focused on inducement of continued performance are generally impermissible."[101]

Although PCS posits its fraud claim details "an elaborate series of misrepresentations about Brightstar's intentions when it approached PCS about a potential merger[,]"[102] the crux of PCS's fraud claim relates to Brightstar's performance under the Buy/Sell Agreement. PCS points to the invoices Brightstar submitted under both iterations of the Buy/Sell Agreement and contends "Brightstar made those representations to PCS with the intention of inducing PCS to rely upon

---

[98]     *Id.*

[99]     *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *8 (Del. Super. Ct. Apr. 16, 2014) (internal quotations omitted).

[100]     *EZLinks Golf, Inc. v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *5 (Del. Super. Ct. Mar. 13, 2017); *Hiller & Arban, LLC v. Reserves Management, LLC*, 2016 WL 3678544, at *4 (Del. Super. Ct. July 1, 2016).

[101]     *Hiller & Arban*, 2016 WL 3678544, at *4 (citing *Cornell Glasgow, LLC v. La Grange Properties, LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012)).

[102]     PCS's Opp'n at 10.

them as accurate and enter into transactions with Brightstar for which PCS would be overcharged."[103]   At best, these allegedly fraudulent statements induced PCS to *continue* performing under the Buy/Sell Agreement.  This is problematic since the alleged fraud encompasses the exact same conduct as that constituting the purported contract breach.

Brightstar's motion to dismiss Counterclaim I alleging fraud is **GRANTED**; PCS fails to plead a fraud counterclaim meeting Rule 9(b)'s particularity standard that is based on conduct separate and distinct from that constituting breach of contract.   And so, the Court need not address duplicative damages or the application of the economic loss doctrine.

### 2. Counterclaim III—Breach of the Implied Covenant of Good Faith and Fair Dealing.

PCS's Counterclaim III alleges that Brightstar breached the implied covenant of good faith and fair dealing by "arbitrarily and unreasonably" delaying resolution of "all amounts due to Brightstar after termination" of the Buy/Sell Agreement and thereby unduly extending the period during which PCS was contractually obligated to abide by the restrictions imposed by the non-circumvention provision of the

---

[103]   Countercls. ¶ 71; *see also id.* ¶ 72 ("PCS would not have entered into transactions under either the Agreement or the Amended Agreement if it had known that Brightstar was overstating its costs, causing PCS to pay inflated amounts for Brightstar's products, Brightstar's built-in profit margins on those products, and the interest accruing on the additional amounts PCS was forced to borrow to finance its payments of overcharges.").

Buy/Sell Agreement.[104] Brightstar argues that Counterclaim III should be dismissed as duplicative of the express terms of the Buy/Sell Agreement—specifically, its dispute resolution provision.[105]

### a. Legal Standard Required of an Implied Covenant Claim.

To state a claim for breach of an implied covenant, a claimant must allege: (1) a specific implied contractual obligation; (2) a breach of that obligation; and (3) resulting damage.[106] In its Counterclaim, PCS identified two "implied" duties breached by Brightstar: "a contractual obligation not unreasonably to withhold consent to a determination of all such amounts [owed] by PCS [post-termination], or in the alternative, to undertake reasonably timely and diligent effort in providing PCS with Brightstar's determination of all such amounts."[107]

Under Delaware law, the implied covenant of good faith and fair dealing attaches to every contract and "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the

---

[104] Countercls. ¶¶ 88–91.

[105] Brightstar's Br. ¶¶ 17–19.

[106] *Khushaim*, 2016 WL 3594752 at *3 (citing *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009)).

[107] Countercls. ¶ 89.

other party to the contract from receiving the fruits' of the bargain."[108] But the express terms of a contract must always control.[109] So an implied covenant can't be used to re-write the agreement,[110] "to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document."[111] Implying a covenant not contracted for by the parties is a "cautious enterprise" that "should be [a] rare and fact-intensive" exercise, governed solely by "issues of compelling fairness."[112] The Court will resort to implying a covenant only when "the contract is truly silent with respect to the matter at hand, and . . . when . . . the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them."[113] Where the questioned contract expressly addresses a

---

[108] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441–42 (Del. 2005) (quotion *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985)).

[109] *Id.* at 441; *see also Kuroda*, 971 A.2d at 888 (holding that in any event, an implied covenant claim cannot be "invoked to override the express terms of [a] contract.").

[110] *Nationwide Emerging Managers, LLC v. NorthPointe Hldgs., LLC*, 112 A.3d 878, 897 (Del. 2015).

[111] *Dunlap*, 878 A.2d at 441–42.

[112] *Id.* at 442 (citing *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)); *Cincinnati SMSA Ltd. Pshp. v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) ("Delaware Supreme Court jurisprudence is developing along the general approach that implying obligations based on the covenant . . . is a cautious enterprise.").

[113] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032–33 (Del. Ch. 2006); *Winshall*, 76 A.3d at 816 (noting that when a sophisticated party "could have easily drafted the contract to expressly" provide a specific contractual right, the failure to do so cannot be remedied by relying on an implied covenant claim).

particular matter, "an implied covenant claim respecting that matter is duplicative and not viable."[114]

### b. The Buy/Sell Agreement is Silent on the Issue of Determining the Total Amount Owed by PCS to Brightstar Post Termination.

The Court may contemplate implying a covenant only if the contract is truly silent on the contested issue.[115] Thus, the Court must first consider whether Brightstar's alleged "arbitrary and unreasonable" delay in cooperating with PCS on the payment dispute is provided for by the express terms of the Buy/Sell Agreement.

PCS's claim rests on the notion that the non-circumvention provision, which limits PCS's ability to purchase mobile devices from certain suppliers[116] "*until the later of sixty (60) days* after the date of the termination notice *or the date that all amounts due to Brightstar* after termination of this [Buy/Sell] Agreement *shall have been Paid*[,]"[117] is silent as to how the amounts owed to Brightstar are to be

---

[114] *Edinburgh Holdings, Inc. v. Education Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018).

[115] *Allied Capital*, 910 A.2d at 1032–33.

[116] These suppliers include SoftBank, Apple Inc., or any entities bearing their trade names, but excluding Sprint Corporation and its affiliates. *See* Buy/Sell Agreement § IV.H, amended by § 3(i) of the Amended Agreement.

[117] Buy/Sell Agreement § IV.H, amended by § 3(i) of the Amended Agreement (emphasis added). The restriction imposed in Section IV.H of the Buy/Sell Agreement provided for a duration lasting for "the Term and for sixty (60) days thereafter *or until such earlier date as* all amounts due to Brightstar after termination of this Agreement shall have been paid[.]"

-28-

determined.[118] Therefore, PCS urges the Court to impute upon Brightstar an implied "contractual obligation" to not "unreasonably withhold consent to a determination," or alternatively, to undertake efforts in providing PCS with Brightstar's determination of all such amounts.[119]

Brightstar contends that the now-contested post-termination payment issue is expressly covered by the dispute resolution provision.[120] The dispute resolution provision states that each party may resort to mediation and/or court proceedings in accordance with the timeline and procedures set forth therein.[121] Brightstar posits that because the dispute resolution clause is available to PCS to resolve the payment dispute, the Buy/Sell Agreement is not silent on the contested issue.[122] According to Brightstar, PCS's failure to use the processes outlined in the dispute resolution provision does not justify inviting the Court to impute an implied contractual obligation upon Brightstar.[123]

---

[118]    Countercls. ¶ 89.

[119]    *Id.* ¶ 89.

[120]    Brightstar's Br. at 18–19.

[121]    *Id.* at 19–20; Buy/Sell Agreement § XI(K) (provides procedures and respective timeline for Mediation and court proceedings).

[122]    Pl./Countercl. Def.'s Reply in Further Supp. of Its Mot. to Dismiss Counts I and III of Def./Countercl. Pl.'s Countercls. at 19-20 (Jan. 31, 2019) (D.I. 27) [hereinafter, "Brightstar's Reply."].

[123]    *Id.* at ¶¶ 19–20.

But the dispute resolution clause Brightstar cites is a generally applicable provision governing "any claim or controversy arising out of" the Buy/Sell Agreement.[124] It is not exclusively pertinent to the resolution of payment disputes; nor does it expressly address the standard of conduct required of the parties in determining post-termination amounts due under the Buy/Sell Agreement.

The non-duplication principle states that where a contract expressly addresses a particular matter, "an implied covenant claim respecting that matter is duplicative and not viable."[125] The Court does not interpret the law as requiring dismissal of PCS's implied covenant claim simply because the Buy/Sell Agreement provided for a method of resolving grievances generally.

### c. *The Implied Covenant Claim Withstands Dismissal.*

Having found that the Buy/Sell Agreement is silent on how the parties should go about determining any post-termination payments, the Court must now address whether PCS's Counterclaim sufficiently pleads an implied covenant claim. The covenant of good faith and fair dealing "embodies the law's expectation that 'each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.'"[126] The good faith and fair dealing covenant protects the

---

[124]    Buy/Sell Agreement § XI(K).

[125]    *Edinburgh Holdings*, 2018 WL 2727542, at *9.

[126]    *Allied Capital*, 910 A.2d at 1032.

spirit of an agreement against underhanded tactics that deny a party the fruits of its bargain.[127] But the implied covenant grants no substantive right that a claimant failed to extract during negotiation.[128]

To sustain a claim for the implied covenant, the claimant must show that (i) the parties' expectations are so fundamental that they "d[o] not feel a need to negotiate about them"[129]; and (ii) the factual allegations underlying the implied covenant claim differ from those supporting an accompanying breach-of-contract claim.[130] Here, the Court finds that PCS's implied covenant claim meets both these criteria.

The implied covenant PCS suggests is that under the non-circumvention clause, Brightstar had an implied obligation to collaborate with PCS to determine the total amounts owed by PCS to Brightstar after the Buy/Sell Agreement was terminated. Under the non-circumvention clause, PCS was prohibited from purchasing mobile devices from several major suppliers, such as SoftBank and

---

[127] *Marshall v. Priceline.com Inc.*, 2006 WL 3175318, at *4 (Del. Super. Ct. Oct. 31, 2006) (citing *Kelly v. McKesson HBOC, Inc.*, 2002 WL 88939, at *10 (Del. Super. Ct. Jan. 17, 2002)).

[128] *Allied Capital*, 910 A.2d at 1032–33 (quoting *Katz v. Oak Industries, Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

[129] *Id.*

[130] *Central Mortg.*, 27 A.3d at 539.

Apple, Inc., and their affiliates until all payments were made to Brightstar.[131] Thus, PCS claims that the collaboration obligation is implied because without collaboratively determining and making the full payments to Brightstar, PCS could be indefinitely subject to the purchasing restriction.[132]

While payment of "all amounts due to Brightstar after termination" is the benchmark to relieve PCS from the purchasing restriction, the non-circumvention clause does not provide how such amounts should be determined. Considering that both parties had a vested interest in determining the total amount owed post-termination, one would naturally infer that each party expected the other to "act reasonably," [133] work collaboratively, and, without undue delay, come to a satisfactory amount. The expectation to act reasonably and collaboratively should be so fundamental to sophisticated parties entering into an agreement after arms-length negotiations that it need not be memorialized in the terms of the agreement itself.

Next, an implied covenant claim requires factual allegations that are different from those underlying any accompanying breach-of-contract claims.[134] Otherwise,

---

[131]     *See* Buy/Sell Agreement § IV.H, amended by § 3(i) of the Amended Agreement.

[132]     PCS's Opp'n at 23.

[133]     *Marshall*, 2006 WL 3175318, at *4.

[134]     *Central Mortg.*, 27 A.3d at 539.

the "implied covenant claim respecting that matter is duplicative and not viable."[135] PCS's Counterclaims include two breach-of-contract counts. Under Counterclaim II, the breach of contract is based on Brightstar allegedly inflating the acquisition costs invoiced to PCS, and seeks damages of the overpayment PCS has made.[136] In Counterclaim V, the breach of contract is predicated on Brightstar's purported violation of the NDA by misappropriating PCS's confidential information acquired during the parties' negotiation and due diligence process.[137] In contrast to these two breach-of-contract counts, PCS's implied covenant claim arises from Brightstar's failure to reasonably determine the total amounts PCS owed to Brightstar after the termination of the Buy/Sell Agreement.[138] The factual allegations underlying these two breach-of-contract claims are markedly different from those giving rise to the implied covenant claim. Thus, the implied covenant claim is not impermissibly duplicative of PCS's breach-of-contract claims.

In turn, Brightstar's motion to dismiss PCS's Counterclaim III alleging a breach of the implied covenant of good faith and fair dealing is **DENIED**.

---

[135] *Edinburgh Holdings*, 2018 WL 2727542, at *9.

[136] Countercls. ¶¶ 79–81.

[137] *Id.* ¶¶ 104–107.

[138] *Id.* ¶¶ 87–92.

## IV. CONCLUSION

Brightstar's suggestions of misappropriation—made without any supporting factual allegations whatsoever—merely recite the elements of a misappropriation cause of action. And so they fail to sufficiently put PCS on notice of the DUTSA claim being brought against it. PCS's motion to dismiss Brightstar's Count II—misappropriation of trade secrets—is **GRANTED**.

PCS fails to plead a fraud counterclaim meeting Rule 9(b)'s particularity standard that is based on conduct separate and distinct from that constituting the breaches of contract it elsewhere alleges. Brightstar's motion to dismiss Counterclaim I alleging fraud is **GRANTED**.

But PCS implied covenant claim is not impermissibly duplicative of its breach-of-contract claims. In turn, Brightstar's motion to dismiss PCS's Counterclaim III alleging a breach of the implied covenant of good faith and fair dealing is **DENIED**.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

-34-